93 P.3d 885 (2004)
122 Wash.App. 156
WHIDBEY ENVIRONMENTAL ACTION NETWORK, Appellant,
v.
ISLAND COUNTY and Western Washington Growth Management Hearings Board, Respondents.
No. 50736-2-I.
Court of Appeals of Washington, Division 1.
June 7, 2004.
Reconsideration Denied July 12, 2004.
*887 David A. Bricklin, Jennifer A. Dold, Bricklin Newman Dold LLP, Seattle, WA, for Appellant.
Joshua Choate, Gregory M. Banks, Island County Prosecutor's Office, Coupeville, WA, Sharon Sullivan Eckholm, Washington Attorney General, Olympia WA, for Respondents.
COX, C.J.
The Whidbey Environmental Action Network (WEAN) appeals the superior court's *888 decision on review of proceedings before the Western Washington Growth Management Hearings Board (Board). The proceedings addressed whether Island County complied with the Growth Management Act (GMA) in enacting its comprehensive plan and development regulations.
Because WEAN fails to show prejudice, we reject its claim for relief based on the superior court arguably exceeding its authority under RCW 34.05.574(1), and for the superior court's alleged failure to review the whole administrative record under RCW 34.05.570. The Board and the superior court did not err when they concluded that the County's comprehensive plan ensured a variety of rural densities. The superior court erred when it reversed the Board's ruling that 25-foot buffers for type 5 streams were inadequate. The Board and the superior court did not err when they refused to require larger buffers for type 3 and 4 streams. The superior court did not err when it reversed the Board's ruling that 25-foot buffers on Category B wetlands were inadequate to provide protection for wildlife habitat. The superior court erred when it reversed the Board's determination that the County's agricultural exemption to its critical areas ordinance was overbroad.
We affirm in part and reverse in part.
WEAN, and another party no longer involved in this case, petitioned for review before the Board, challenging the County's 1998 comprehensive plan, the zoning code, and the fish and wildlife habitat conservation areas provisions. The Board took testimony and other evidence.
In June 1999, the Board issued a Final Decision and Order (FDO). The Board concluded that the County should reconsider its 5-acre zoning throughout the remaining 40 percent of rural zone acreage, and ordered the County to adopt an interim rural density ordinance that would limit any subdivision to 10-acre lots. The Board also concluded that the County's agricultural exemption for lands not designated for agricultural conservation did not comply with the GMA. The Board determined that the County's type 5 stream buffer was noncompliant. The Board concluded the County's type 3 and 4 stream buffers complied with the GMA. The Board stated that if the County was relying in part on the Category B wetlands and their 25-foot buffers to protect wildlife functions, it did not comply with the GMA. The FDO further directed the County to take remedial action by November 1999.
In response, the County amended various provisions of its laws. A series of compliance hearings before the Board followed.
The Board determined in its October 2000 Compliance Hearing Order that the County's choice to adopt alternative regulations to protect rural character, rather than down-zoning lands in the rural area to the 10-acre lot size previously directed by the Board, was not clearly erroneous. The Board decided that rural forest and rural agriculture zones did contribute to a variety of rural densities.
In its November 2000 Compliance Hearing Order, the Board determined that the County remained noncompliant with the GMA regarding the application of the agricultural exemption to lands not designated commercial agriculture or rural agriculture. The Board found partial compliance by the County with the Category B wetland buffers, which were increased from 25 to 50 feet for the rural residential zone. But the Board found the County's 25-foot buffer noncompliant for the remaining zones. The Board reaffirmed its finding of invalidity as to type 5 stream buffers, and ordered that the buffers be increased from 25 to 50 feet.
The County sought judicial review of the Board's determinations of noncompliance in the superior court. These included the agricultural exemption for existing and ongoing agriculture, the County's 25-foot buffer requirement for type 5 streams, and the County's requirement for 25-foot buffers for Category B wetlands.
WEAN sought review of the Board's determinations of compliance. These included the County's requirements for buffers on type 3 and 4 streams and the County's requirement for five-acre minimum lot sizes in the rural zone.
The superior court ruled in favor of the County on every issue, reversing the Board's *889 findings of noncompliance and invalidity, and affirming the findings of compliance.
WEAN appeals.

STANDARD OF REVIEW
The Legislature enacted the GMA to minimize threats that uncoordinated and unplanned growth pose to the environment, economic development, and public welfare.[1] The GMA requires communities to coordinate comprehensive land use planning, and counties to adopt comprehensive land use plans and development regulations in accordance with the GMA.[2] The Legislature granted wide latitude to local governments to customize their comprehensive plans according to local growth patterns, resources, and needs.[3]
The Board is charged with adjudicating GMA compliance, and, when necessary, with invalidating noncompliant comprehensive plans and development regulations.[4] The Board "shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]."[5] To find an action "clearly erroneous," the Board must be "left with the firm and definite conviction that a mistake has been committed."[6]
On appeal, we base our review on the record before the Board.[7] "We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court."[8]
Of the nine possible grounds for relief from an agency decision, three are at issue here:
...
(d) The agency has erroneously interpreted or applied the law;
(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
...
(i) The order is arbitrary or capricious.[[9]]
This court reviews the Board's legal conclusions de novo.[10] We accord deference to [the Board's] interpretation of the law, but its interpretations are not binding.[11] As used in RCW 34.05.570(3)(i), "arbitrary and capricious" means "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous."[12]
The burden of demonstrating the invalidity of agency action is on the party asserting the invalidity.[13] Thus, the County has the burden *890 concerning type 5 stream buffers, wildlife habitat protection under Category B wetland buffers, and the agricultural exemption to the critical areas ordinance. WEAN has the burden concerning rural density preservation, and type 3 and 4 stream buffers.
We first address two procedural arguments by WEAN. First, WEAN contends that the superior court exceeded the proper scope of review under the Administrative Procedure Act by finding compliance on matters solely within the Board's discretion.[14] Second, WEAN contends that the superior court failed to review the "whole record" in violation of RCW 34.05.570 before rendering its decision.[15] Both arguments suffer from the same problem: lack of a showing of prejudice.
As to the former claim, the superior court did state, "the County ordinances concerning the use of 25-foot buffers on Type 5 streams substantively included best available science." But the court also remanded the case to the Board for further proceedings.[16] We fail to see any prejudice to WEAN by the full scope of the court's action, particularly in view of our ultimate ruling on this point in this opinion.
As to the latter claim, we review the entire record of the Board, even if the superior court did not.[17] Assuming without deciding that the whole record was not before the trial court at the time of its ruling, WEAN fails to show prejudice.
Because WEAN fails in this respect for both procedural claims, reversal on these bases is not warranted.

RURAL DENSITIES
WEAN argues, under RCW 34.05.570(3)(d), that the Board erroneously interpreted or applied the law by requiring satisfaction of a "significant blocks" test. The GMA does not appear to sanction such a test. We nevertheless conclude that the Board's determination was proper on the basis of other grounds that we discuss below.
The GMA requires participating counties to identify and protect rural lands not designated for urban growth, agriculture, forest, or mineral resources.[18] The rural element must provide for a variety of rural densities and uses.[19] To achieve a variety of densities and uses, "counties may provide for clustering, density transfer, design guidelines, conservation easements, and other innovative techniques that will accommodate appropriate rural densities and uses that are not characterized by urban growth and that are consistent with rural character."[20] "Rural character" is defined in RCW 36.70A.030(14).[21]
*891 Island County's rural area is comprised of four zones: rural residential (RR), rural agriculture (RA), rural (R), and rural forest (RF). RF and RA zoning permits one dwelling per 10 acres.[22] R zoning permits one dwelling per 5 acres.[23] R zoning  permitting a pattern of 5-acre lots throughout the zone  is at issue here.
WEAN maintains that the significant blocks test articulated by the Board was an error of law. We agree.
"The Act does not require a particular methodology for providing for a variety of densities."[24] And RCW 36.70A.050 allows for consideration of local conditions and the use of unspecified "innovative techniques" to achieve rural densities and uses. But nowhere in the GMA is there any articulation of a requirement that a pattern of significant blocks of large lands remain before relief will be granted. And as this case illustrates, there is a dispute within the Board whether such significant blocks exist.
In short, we accept as persuasive WEAN's argument that, quite simply, the test for the existence of a variety of rural densities and uses is whether the County's rural element has provided for such densities and uses. The "significant blocks" test is not consistent with this approach.
Nevertheless, a correct judgment will not be reversed when it can be sustained on any theory, even though different from the one relied upon by the finder of fact.[25]
The Board's decision rested more broadly than on simple reliance on the significant blocks test. Under the GMA, the County can account for unique local conditions in drafting its regulations.[26] The Board found most of the local conditions outlined by the County to be convincing reasons to depart from a downzoning requirement on rural zoned lands, including the densely populated nature of the county, and the fact that the County does not fit the prototypical GMA model because its three cities account for only four percent of the land area and 30 percent of the population. The Board also noted that, excluding land in the UGA's, the County only has 27,500 acres that can be divided into either 10-acre or 5-acre lots, and that for the last 30 years, land division has accounted for an "inconsequentially small number of new lots." It concluded, "we are not left with the firm and definite conviction that the County was clearly erroneous in choosing to adopt alternative regulations to protect rural character rather than downzoning additional lands in the rural area."[27]
Furthermore, the GMA allows for the use of "other innovative techniques that will accommodate appropriate rural densities and uses that are not characterized by urban growth and that are consistent with rural character."[28] The Board found that the County's adoption of other regulations to protect the rural character were persuasive alternatives in light of the County's unique local circumstances. These other regulations included addressing visual compatibility, instituting a five percent limit on building coverage, drafting an "excellent" Planned Residential Developmentordinance, and storm water protection. WEAN does not challenge these alternatives, but limits its challenge to the failure of the Board to order the County to downzone.
Finally, the Board found that the zoning requirements for RF (10 acres) and RA (10 acres) zones contributed to a variety of rural *892 densities and that WEAN had failed to convince the Board that lands zoned RF could be easily rezoned and the density increased. A 5-acre lot size is not, of itself, in violation of the rural element portion of the GMA because the 5-acre lot size is a "decidedly rural density."[29]
We conclude that the Board did not err when it determined that the County's approach was not clearly erroneous. WEAN fails in its burden to show otherwise.
WEAN also argues that the Board's decision was arbitrary and capricious because it considered an improper factor. This argument is not persuasive.
WEAN maintains that the Board was improperly influenced by the fact that another party challenging the County regulation, the Coalition, changed its position on the rural density issue and advocated for a finding of compliance. WEAN points to the Board's Compliance Hearing Order of October 2000.
The Coalition was the petitioner who convinced us last year that continuing to allow the creation of 5-acre or smaller lots over the great majority of the rural area presented an "undue threat" to natural resource lands (NRLs), CAs and rural character; failed to comply with the Act and warranted invalidity. Now, after participating in the review process and successfully convincing the County to take other actions to protect CAs and preserve rural character, the Coalition asks us to find compliance on this issue. This change in position, as well as unique local circumstances, has had considerable impact on our decision.[30]
The Board went on to address WEAN's concerns with the 5 acre zoning, concluding that the County's "truly unique set of local circumstances" warranted a finding of compliance. This is not willful and unreasoning action. The Board's analysis gave due consideration to the facts and circumstances surrounding this issue. The finding of compliance was not arbitrary and capricious, and WEAN fails to show otherwise.

TYPE 5 STREAM BUFFERS
The County argues that substantial evidence did not support the Board's order, and that the Board failed to defer to the County's discretionary balancing of the best available science (BAS) with other factors. The County also argues that the Board erred when it ignored the testimony of the County's expert and determined that his expert opinion was not BAS. The County also argues that the range of BAS included 25-foot buffers for type 5 streams and the Board erred in determining otherwise. Finally, the County argues that the Board improperly used a preponderance of the evidence standard to evaluate the science in the record. We conclude that substantial evidence supported the Board's finding of noncompliance, and the County's other arguments are unpersuasive.
Under RCW 36.70A.060(2) and (3), the County is required to adopt development regulations that protect critical areas. Critical areas include: (a) wetlands; (b) areas with a critical recharging effect on aquifers used for potable water; (c) fish and wildlife habitat conservation areas; (d) frequently flooded areas; and (e) geologically hazardous areas.[31]
The County declared streams to be a fish and wildlife habitat conservation area.[32] The County also established a system of buffers for the stream types found in the county. A type 5 stream is a stream that is less than two feet wide and does not support salmon or other fish.[33] Type 5 streams usually run dry during some part of the year. The County recommended a 25-foot buffer for this type of stream.
Responding to the Board's FDO determination of noncompliance, the County required a 50-foot buffer for any type 5 stream tributary *893 to a salmon bearing stream and for any type 5 stream located in the rural zone.[34] But the Board determined that the County was still noncompliant and ordered it to require 50-foot buffers for all type 5 streams, without qualification.
RCW 36.70A.172(1) requires that BAS shall be included "in developing policies and development regulations to protect the functions and values of critical areas." This court held "that evidence of the best available science must be included in the record and must be considered substantively in the development of critical areas policies and regulations."[35]
The scientific evidence in the record constitutes substantial evidence to support the Board's determination of noncompliance.
The Washington Department of Fish and Wildlife (WDFW) recommends buffers of 150 feet to 225 feet for type 5 streams, depending on their susceptibility to erosion.[36] A study by Desbonnet and others supported a minimum buffer width of 15 meters for wildlife habitat protection and as little as a 2-meter buffer to maintain stream channel stability, and a range of 10 to 93 meters to protect water quality.[37] A study by Johnson and Ryba recommended buffers of 15 to 30 meters to provide "minimal maintenance for most functions."[38] But Johnson and Ryba observed, "[m]ost investigators recommend buffer widths of 30 to 122 m."[39] The Department of Ecology (DOE) maintained that 25 feet was inadequate to protect all stream functions and asserted that the County considered only water quality issues and neglected to consider the biological functions of riparian buffers.[40]
A study by Castelle and others recommends 15 to 30 meter buffers for the protection of streams "under most circumstances."[41] They noted, "that buffers less than 5 to 10 meters provide little protection of aquatic resources under most conditions."[42] Notwithstanding the recommendations in his written studies, Castelle testified at the hearing that a 25-foot buffer on type 5 streams was recommended and within the range of evidence on the subject.[43]
There is a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the Board's order that the County failed to comply with the GMA concerning type 5 stream buffers.
Furthermore, the County fails to point to any part of the record outlining the applicability of unique local conditions to justify a departure downward from the buffer width requirements outlined in the scientific literature. HEAL requires that evidence of BAS must be included in the record and must be considered substantively in the development of critical areas policies and regulations.[44]
The County is correct when it asserts that, under the GMA, it is required to balance the various goals of GMA set forth in RCW 36.70A.020. It is also true that when balancing those goals in the process of adopting a plan or development regulation under GMA, a local jurisdiction must consider BAS regarding protection of critical areas. This does not mean that the local government is required to adopt regulations that are consistent *894 with BAS because such a rule would interfere with the local agency's ability to consider the other goals of GMA and adopt an appropriate balance between all the GMA goals. However, if a local government elects to adopt a critical area requirement that is outside the range that BAS alone would support, the local agency must provide findings explaining the reasons for its departure from BAS and identifying the other goals of GMA which it is implementing by making such a choice. The County references an "extensive inventory of the County's wildlife and habitat" conducted by Castelle. But this inventory was limited to "the shoreline environment of Island County"[45] and has questionable application to interior stream buffer issues.
The County did not make any findings about the applicability of unique local conditions or otherwise explain why it chose to adopt a buffer for Type 5 streams that was outside the range of BAS. In the absence of such an explanation, the Board was correct when it found the County's Type 5 stream buffer noncompliant.
The Board's finding of noncompliance was supported by substantial evidence, and the County fails to show otherwise.
The County contends that Andrew Castelle's recommendation for 25-foot buffers was BAS and that the Board willfully disregarded Castelle's expertise in this area, rendering the finding of noncompliance arbitrary and capricious. The Board was free to choose from among competing evidence, and doing so was not arbitrary or capricious.
The County relied heavily on Castelle, a certified wetlands scientist with a focus on soil and water interaction in forested wetlands. The County hired him to advise them on this and other matters relevant to GMA compliance. The Board concluded that the County failed to use BAS in its type 5 stream buffer regulations. At best, Castelle's testimonial information was incomplete BAS because Castelle conceded that he formulated his recommendations based on water quality functions, rather than looking at the entirety of functions attributed to stream buffers  including the protection of wildlife species other than fish.[46]
The Board was not willfully disregarding Castelle's expert opinion, as argued by the County. Rather, the Board was disagreeing with the County as to the content of BAS presented to the Board. This was not arbitrary and capricious.
The County also argues that because the range of evidence of BAS includes 25- foot buffers for type 5 streams, we should affirm the superior court's decision. We again disagree.
While 25-foot buffers did fall within the range of some of the evidence given, they did so only with specific and narrow functions in mind, rather than the entirety of functions attendant to type 5 streams. Even Castelle himself testified, in response to a question concerning how his recommendations compared to those of the WDFW for type 5 buffer widths, "... I didn't consider specific wildlife species other than fish because I didn't think that the riparian buffer section was the appropriate place to do that."[47] But the GMA requires that the regulations for critical areas must protect the "functions and values" of those designated areas.[48] This means all functions and values.
The County relies heavily on specialized studies that fail to consider the multiple functions of a stream buffer rather than just one isolated function. The study cited in Johnson and Ryba as supporting 3-meter buffers dealt only with sediment removal. Johnson and Ryba observed, "[t]he widest range in recommended widths was for buffers to filter suspended sediments. This is largely due to one reference (Wilson 1967) that reports separate *895 buffer widths for filtering sediment particles of different sizes. These include sand (3 m), silt (15 m), and clay (122 m)."[49] The Board did not err in finding noncompliance.
Finally, the County contends that the Board erroneously used a preponderance of the evidence standard that allowed WEAN to escape its burden of proving non-compliance. We disagree.
The County cites to a single section in the Board's decision where the Board states, "[t]he majority of these studies showed that a minimum of 15 meters was needed for in-stream water quality." But observing that the majority of the scientific information supports greater than 25-foot buffers is not, of itself, reliance on a preponderance of the evidence standard. The Board went on to specify the reasons for its decision, including the fact that not even Castelle's own studies supported 25-foot buffers for in-stream water quality, let alone other buffer functions. The Board also observed that other regulations provided by the County, including the possibility of increased buffer sizes based on individual cases, and the County's "holistic" approach, failed to provide assurances of "minimal effective protection."
We conclude that the Board's determination was correct, and the County has failed in its burden to show otherwise.

TYPE 3 AND 4 STREAM BUFFERS
WEAN argues that the Board failed to articulate the basis for its decision concerning type 3 and 4 buffers, in violation of RCW 34.05.461(3) and (4). WEAN also argues that the evidence was insufficient to support the Board's ruling that buffers for type 3 and 4 streams were adequate. We conclude that sufficient evidence supported the Board's finding of compliance.
The County claims that WEAN failed to preserve below the issue of inadequate findings by the Board on type 3 and 4 stream buffers. WEAN concedes that it did not do so, but requests that this court consider this issue. We decline to do so. The remedy WEAN seeks is remand to the Board for the entry of a decision consistent with RCW 34.05.461(3) and (4). But the standard of review employed by this court does not compel remand. We review the record for "evidence that is substantial when viewed in light of the whole record before the court..."[50] WEAN did raise its substantive challenge to the finding of compliance on type 3 and 4 stream buffers below, and has not demonstrated any prejudice from the procedural shortcomings of the Board. There is no reason why we cannot review the record for substantial evidence on this issue. Therefore, we decline to address WEAN's additional challenge to the Board's finding of compliance based on inadequate findings under RCW 34.05.461(3) and (4) and instead address WEAN's contention that the evidence was insufficient to support the Board's finding of compliance for type 3 and 4 stream buffers.
We conclude that substantial evidence exists to support the Board's conclusion. A type 4 stream is a stream that is two feet or wider at its ordinary high water mark.[51] It is not used by a significant number of fish and its primary importance is protecting water quality downstream.[52] The County recommended 50-foot buffers for type 4 streams.[53] A type 3 stream is a stream that has anadromous fish (salmon) and is five feet or wider, or bears resident game fish and is 10 feet or wider.[54] The County recommended 75-foot buffers for type 3 streams without anadromous fish and a 100-foot buffer for type 3 streams with anadromous fish.[55] WEAN argues that these buffer widths are smaller than the 100 foot minimum for all streams recommended by the scientific community.
*896 WEAN directs us to the same analysis and arguments it used concerning type 5 streams above. Our review of BAS before the Board supports the conclusion that the County was in compliance concerning type 3 and 4 stream buffers because BAS does not require a 100-foot minimum for all streams.
WDFW recommends buffers of 150 feet for type 3 streams and 150 feet to 225 feet for type 4 streams, depending on their susceptibility to erosion.[56] A study by Castelle and others recommends 15 to 30 meter buffers for protection of streams "under most circumstances."[57] A study by Desbonnet and others supported a minimum buffer width of 15 meters for wildlife habitat protection and as little as a 2-meter buffer to maintain stream channel stability, and a range of 10 to 93 meters to protect water quality.[58] A study by Johnson and Ryba recommended buffers of 15 to 30 meters to provide "minimal maintenance for most functions."[59] But Johnson and Ryba observed, "[m]ost investigators recommend buffer widths of 30 to 122 m."[60]
Despite WEAN's contention that Castelle fatally relied on buffer widths relating only to water quality, rather than other functions, other studies, as cited above, recommend 15 to 30 meter buffers for minimal maintenance of most functions, without reference to stream size.
We conclude that WEAN has failed to prove that the Board's order of compliance was not supported by substantial evidence.

CATEGORY B WETLANDS BUFFERS FOR WILDLIFE
The County argues that the Board lacked subject matter jurisdiction to review the 25-foot buffers on Category B wetlands. In the alternative, the County argues that the Board exceeded its authority when it allegedly required that the 1992 wetlands ordinance include BAS.
WEAN challenged the County's use of its preexisting wetlands ordinance for the protection of wildlife under the GMA in 1998. In the FDO the Board stated that if the County was relying in part on the 25-foot buffers for Category B wetlands to protect wildlife functions, then the County was not in compliance because BAS required a minimum of 50-foot buffers to protect wildlife.
The County subsequently amended its regulation to require 50-foot buffers for Category B wetlands in the R zone only. In the remaining zones, the 25-foot buffer requirement remained. The Board concluded that the County was in compliance as to the R zone, but was noncompliant in the other zones.
The County appealed to the superior court. The court declined to rule for the County on the jurisdictional challenge. It instead considered the merits of the County's argument that BAS requirements were not applicable to the wetlands regulations. The court held that the Board erred in finding noncompliance.
Under RCW 36.70A.280(1)(a) the growth management hearings boards shall hear petitions alleging that a state agency, county or city is not in compliance with the requirements of the GMA. "[T]he term subject matter jurisdiction is generally taken to mean the court's authority to hear and decide a particular kind of case  marriage dissolutions, probate, felony criminal cases, claims for injunctive relief, and so forth."[61]
Even if the Board had subject matter jurisdiction, the County argues that WEAN's appeal of this matter was six years too late and thus the Board lacked the authority to hear this particular issue. If the challenge were to the wetland buffers alone, the Board acknowledged that the County was correct. "[T]he wetland buffer sizes are not able to be *897 directly challenged in this appeal."[62] Thus, the question becomes whether the Board exceeded its authority when it required that the 1992 wetlands ordinance include BAS. The County contends that the 1995 BAS requirement for the protection of critical areas operated prospectively only.
RCW 36.70A.172 requires that the County establish regulations to protect critical areas, including fish and wildlife habitat. RCW 36.70A.172 requires that BAS be used to develop policies and development regulations to protect the functions and values of these critical areas. The BAS requirement was added to the GMA in 1995.
The County argues that the Board incorrectly applied the BAS requirement retroactively to the 1992 wetlands regulations. Although it is true that the 1995 amendment to the GMA requiring inclusion of BAS does not operate retroactively, this argument confuses the true issue.[63]
If the County were relying substantively on the wetlands buffers to satisfy its obligation under RCW 36.70A.172 to protect fish and wildlife habitat, those preexisting regulations must be subject to the applicable critical areas analysis to ensure compliance with GMA requirements. Otherwise, a county could use myriad preexisting regulations in an attempt to satisfy GMA critical areas requirements without actually having to include BAS analysis. This would contravene RCW 36.70A.172.
But the record is clear that the County relied on the 1992 Category B wetland buffers to protect wetland functions, not wildlife.[64] It did indicate that the buffers may have ancillary benefits to wildlife, but the County did not claim the 25-foot buffers were designed or intended to also satisfy GMA requirements for wildlife protection. Rather, it has adopted Ordinance C-62-98 which contains "development regulations that protect fish and wildlife conservation areas."[65] In its November 18, 1998 order, the Board ruled that these regulations "procedurally complied with the Growth Management Act."[66] Then, according to WEAN, that group filed a "new petition, ... challeng [ing] the regulation's substantive compliance with the GMA, including the BAS requirements, which led, in part, to the case before the Court here."[67] Those fish and wildlife protection regulations have not been challenged in this appeal. Rather, the Board ruled that "if the County is relying in part on Category B wetlands and their 25-foot buffers to protect wildlife functions, the County is not in compliance with the Act."[68] Because the County has adopted separate regulations for wetlands (ICC 17.02.110(A)) and fish and wildlife protections (ICC 17.02.110(C)), the Board erred in invalidating the wetland buffers because they were inadequate to protect fish and wildlife. As the Board recognized, "the wetland buffer sizes are not able to be directly challenged in this appeal."[69] It could only reach the issue "if the County is relying in part on Category B wetlands ... to protect wildlife functions."[70] Because ICC 17.02.100(c) addresses that issue, we affirm the trial court's ruling reversing the Board's holding that the County's 25-foot Category B wetland buffers did not comply with BAS and the GMA.

*898 AGRICULTURAL EXEMPTION
The County contends that the Board erred as a matter of law when it adopted a "no balancing" rule that restricted the County's discretion to balance the various GMA goals. The County also argues that the Board ignored the County's evidence that the agricultural exemption was subject to best management practices (BMP) and thus was not open to indiscriminate use in the R zone in violation of critical area protections. We conclude that we need not decide whether the no balancing rule articulated by the Board was an improper reading of the statute. Rather, we conclude that there is no evidence in the record that an exemption of the scope granted by the County is necessary for R lands.
Under RCW 36.70A.060(2), the County is required to adopt development regulations that protect critical areas. The County is also required to designate and conserve agricultural lands of long-term significance.[71] The GMA requires counties to balance more than a dozen goals, listed in RCW 36.70A.020, and several specific directives in implementing those goals.[72] One of these goals is RCW 36.70A.020(8), which states that the County must "[m]aintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries. Encourage the conservation of productive forest lands and productive agricultural lands, and discourage incompatible uses."
In addition to adopting its critical areas ordinance, the County also created an exemption to that ordinance for agricultural activities. It exempts "[e]xisting and on-going agricultural activities when undertaken pursuant to best management practices to minimize impacts to critical areas."[73]
The Board held that as to lands designated RA, the exemption complied with the GMA. The Board also held that the BMP choices of the County concerning the application of the exemption to Category A wetland buffers and Category B wetlands were in compliance with the GMA. But the Board concluded that the County had inappropriately balanced "non-designated agricultural uses" against critical area protections by allowing the application of the exemption to agricultural activities, including hobby farms, in the R zone. This latter conclusion is the focus of our analysis here.
The County argues that the Board erred as a matter of law when it adopted a "no balancing" rule that restricted the County's discretion to balance GMA goals to maintain and enhance agriculture and to protect critical areas in the County's rural area. The County argues that RCW 36.70A.020(8) allows it to consider agricultural uses on non-designated natural resource lands, and that the Board's attempts to limit these considerations with the imposition of its "no balancing" rule was improper.
The construction of a statute is a question of law that we review de novo.[74] The essence of the County's argument is that the plain words of RCW 36.70A.020(8) read more broadly than the Board concluded. Specifically, although the second sentence of that statute appears to limit any balancing to consideration of "agricultural lands," as defined in RCW 36.70A.030(2),[75] the first sentence arguably sweeps more broadly  encompassing agricultural industries. This latter term is undefined in the GMA, but does not appear to be limited to lands.
WEAN does not directly respond to this statutory construction argument. Rather, it relies on other arguments to support its conclusion *899 that the decision of the Board was correct.
We need not decide whether the Board's reading of the statute was correct in this case. Rather, we conclude that there is no evidence to support the application of such a broad exemption to R lands and affirm the Board's finding of noncompliance on that basis.
We are in agreement with WEAN and the Board that if the agricultural exemption exists to help the County conserve all agricultural activities, there should be some evidence in the record to support the need for an agricultural exemption on all lands, including R zoned lands. The County fails to cite to anything in the record to support the claim that the exemption is necessary to protect agricultural activities.
The Board observed:
The record contains no information as to how many acres are being `farmed' (no matter how casually), where those are located and what their cumulative impact might be on critical areas. The record does show that only 60 acres of land in the RR zone [sic] is in the agricultural tax program. Further, the County provides none of this RR [sic] `agricultural' activity with GMA protections such as notification to adjacent landowners or application of its nuisance protection regulation.
There is simply no evidence to support the County's assertion that the goal of protecting or preserving agricultural activities on R lands is furthered by the application of the exemption.
The County also argues that the requirement that those claiming the exemption employ BMP, and the Board's finding that the BMP included BAS, renders the exemption GMA compliant as to critical area protection, regardless of the lack of evidence in the record supporting broad application of the exemption. This argument is not persuasive. Although the County cites to the November 2000 Compliance Hearing Order to support its contention that the Board found the BMPs compliant with BAS, the County is wrong. The Board found the exemption GMA compliant as to Category A and B wetlands and streams. It did not make any determination as to the use of BAS in the BMPs, or the application of BMPs to R lands. Again, the County fails to point to evidence in the record that proves that BAS was employed in crafting the exemption or the BMPs to which the exemption is allegedly subject on R lands.
In short, the record does not support the County's contention that such a broad exemption, which includes all R lands, is necessary, or that BAS was considered in creating the exemption.
The County also argues that the Board improperly shifted the burden from WEAN to the County. The County is mistaken. The Board simply required that the County comply with the GMA and determined that it had not. This is not impermissible burden shifting.
Finally, the County argues that the Board's decision resulted in an arbitrary and unlawful taking of private property. Because we conclude that the Board did not err when it found the County noncompliant on this issue, we decline to conclude, as the County argues, that there was an "unreasoned taking of land." Furthermore, the County's argument that there will be "unnecessary and considerable loss of arable land and money at the farmer's expense" is speculation and not supported by any citation to the record.
We affirm in part and reverse in part the decision of the superior court.
AGID and APPELWICK, JJ., concur.
NOTES
[1] RCW 36.70A.010.
[2] RCW 36.70A.040.
[3] RCW 36.70A.010-901.
[4] RCW 36.70A.280; RCW 36.70A.302.
[5] RCW 36.70A.320(3).
[6] Dep't of Ecology v. Pub. Util. Dist. No. 1, 121 Wash.2d 179, 201, 849 P.2d 646 (1993).
[7] Buechel v. Dep't of Ecology, 125 Wash.2d 196, 202, 884 P.2d 910 (1994).
[8] City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 45, 959 P.2d 1091 (1998).
[9] RCW 34.05.570(3)(d), (e), (i).
[10] Diehl v. Mason County, 94 Wash.App. 645, 652, 972 P.2d 543 (1999).
[11] City of Redmond, 136 Wash.2d at 46, 959 P.2d 1091.
[12] City of Redmond, 136 Wash.2d at 46-47, 959 P.2d 1091 (quoting Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6, 118 Wash.2d 1, 14, 820 P.2d 497 (1991)).
[13] RCW 34.05.570(1)(a).
[14] The court may order an agency to take action required by law, "order an agency to exercise discretion required by law, set aside agency action, enjoin or stay the agency action, remand the matter for further proceedings, or enter a declaratory judgment order." RCW 34.05.574(1).
[15] Under RCW 34.05.570 the superior court can grant relief from an agency order only if "the order is not supported by evidence that is substantial when viewed in light of the whole record before the court[. ]" (italics ours).
[16] Manke Lumber Co., Inc. v. Diehl, 91 Wash.App. 793, 810, 959 P.2d 1173 (1998), review denied, 137 Wash.2d 1018, 984 P.2d 1033 (1999) (concluding that although the superior court in part usurped the Board's role of determining GMA compliance, the court nevertheless remanded the matter for further proceedings).
[17] Manke Lumber, 91 Wash.App. at 810, 959 P.2d 1173 (concluding there was no prejudice by the superior court's ruling because the court of appeals reviews the Board's order directly).
[18] RCW 36.70A.070(5).
[19] RCW 36.70A.070(5)(b).
[20] RCW 36.70A.070(5)(b).
[21] "Rural character" refers to the patterns of land use and development established by a county in the rural element of its comprehensive plan:

(a) In which open space, the natural landscape, and vegetation predominate over the built environment;
(b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
(c) That provide visual landscapes that are traditionally found in rural areas and communities;
(d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;
(e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;
(f) That generally do not require the extension of urban governmental services; and
(g) That are consistent with the protection of natural surface water flows and ground water and surface water recharge and discharge areas.
[22] ICC 17.03.110(D)(1).
[23] ICC 17.03.060(C)(1).
[24] Achen v. Clark County, WWGMHB No. 95-2-0067, Final Decision and Order (September 20, 1995), at 17.
[25] See LaMon v. Butler, 112 Wash.2d 193, 200-01, 770 P.2d 1027, cert. denied, 493 U.S. 814, 110 S.Ct. 61, 107 L.Ed.2d 29 (1989).
[26] RCW 36.70A.070(5)(a).
[27] (Emphasis added.)
[28] RCW 36.70A.070(5)(b).
[29] Skagit Surveyors and Engineers, LLC v. Friends of Skagit County, 135 Wash.2d 542, 571, 958 P.2d 962 (1998).
[30] (Emphasis added.)
[31] RCW 36.70A.030(5).
[32] ICC 17.02.110(C).
[33] ICC 17.02.110(C) at Table 17.02.110(C).
[34] Ordinance C-03-00, Exhibit A-3.
[35] Honesty in Environmental Analysis & Legislation (HEAL) v. Central Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 532, 979 P.2d 864 (1999).
[36] Letter from WDFW to Island County Board of Commissioners of 5/8/98 at 1.
[37] ALAN DESBONNET, ET AL., VEGETATED BUFFERS IN THE COASTAL ZONE: A SUMMARY REVIEW AND BIBLIOGRAPHY 20, 26-29 (1994).
[38] ALAN JOHNSON AND DIANE M. RYBA, A LITERATURE REVIEW OF RECOMMENDED BUFFER WIDTHS TO MAINTAIN VARIOUS FUNCTIONS OF STREAM RIPARIAN AREAS 13 (1992).
[39] JOHNSON & RYBA, at 6.
[40] Letter from Susan Meyer, DOE, to Michael Shelton, Island County Commissioner of 9/8/99; Letter from DOE to Michael Shelton of 2/9/00.
[41] A.J. CASTELLE, ET AL., WETLAND AND STREAM BUFFER SIZE REQUIREMENTS  A REVIEW, 23 J. ENVIRON. QUAL. . 878, 881 (1994).
[42] CASTELLE, ET AL., at 881.
[43] Partial Transcript of Hr'g on 7/27/98, at 5.
[44] HEAL, 96 Wash.App. at 532, 979 P.2d 864.
[45] Partial Transcript of Hr'g on 7/27/98, at 32.
[46] Partial Transcript of Hearing on 7/27/98, at 33 (I didn't, "I didn't consider specific wildlife species other than fish because I didn't think that the riparian buffer section was the appropriate place to do that."); Memorandum from Andy Castelle to Alison Moss of 9/13/99 ("The fourth function is wildlife habitat, but the stream section of the CAO was written to address stream and fisheries protection, not wildlife.").
[47] Partial Transcript of Hearing on 7/27/98, at 33.
[48] RCW 36.70A.172(1).
[49] JOHNSON & RYBA, at 6.
[50] RCW 34.05.570(3)(e).
[51] ICC 17.02.110(C) at Table 17.02.110(C).
[52] ICC 17.02.110(C) at Table 17.02.110(C).
[53] ICC 17.02.110(C)(3).
[54] ICC 17.02.110(C) at Table 17.02.110(C).
[55] ICC 17.02.110(C)(3).
[56] Letter from WDFW to Island County Board of Commissioners of 5/8/98 at 1.
[57] CASTELLE, ET AL., at 881.
[58] DESBONNET, ET AL., at 20, 26-29.
[59] JOHNSON & RYBA, at 13.
[60] JOHNSON & RYBA, at 6.
[61] 15A KARL B. TEGLAND & DOUGLAS ENDE, WASHINGTON PRACTICE, WASHINGTON HANDBOOK ON CIVIL PROCEDURE, § 9.2, at 115 (2003).
[62] Final Decision and Order June 2, 1999 at 64; RCW 36.70A.290(2).
[63] A statutory amendment is presumed to be prospective in application only. The presumption of prospective application can be overcome only by showing (1) the Legislature intended the amendment to apply retroactively; (2) the amendment is curative; or (3) the amendment is remedial. State v. Smith, 144 Wash.2d 665, 673, 30 P.3d 1245 (2001). None of those factors is present here, thus prospective application is proper.
[64] WWGMHB No. 98-2-0023c, Compliance Hearing Order on FDO Remand Issues 10, 14 and 15 at 8.
[65] WWGMHB No. 97-2-0064 Compliance Order (Nov. 18, 1998).
[66] WWGMHB No. 97-2-0064 Compliance Order (Nov. 18, 1998).
[67] WEAN's Response to Island County's Motion for Reconsideration at 17, n.6.
[68] Final Decision and Order June 2, 1999 at 64 (emphasis added).
[69] Final Decision and Order June 2, 1999 at 64.
[70] Final Decision and Order June 2, 1999 at 64.
[71] RCW 36.70A.170(1)(a).
[72] See HEAL, 96 Wash.App. at 531, 979 P.2d 864.
[73] ICC 17.02.107(E)(1).
[74] Rettkowski v. Dep't of Ecology, 128 Wash.2d 508, 515, 910 P.2d 462 (1996).
[75] "Agricultural land" means land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, Christmas trees ... finfish in upland hatcheries, or livestock, and that has long-term commercial significance for agricultural production.