190 P.3d 38 (2008)
THURSTON COUNTY, Petitioner,
v.
WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD and 1000 Friends of Washington, Respondents, and
Building Industry Association of Washington, Olympia Master Builders, and People for Responsible Environmental Policies, Petitioner-Intervenors.
No. 80115-1.
Supreme Court of Washington, En Banc.
Argued March 20, 2008.
Decided August 14, 2008.
*40 Jeffrey George Fancher, Attorney at Law, Andrew C. Cook, Building Industry Association of Washington, Olympia, WA, Richard L. Settle, Foster Pepper PLLC, Seattle, WA, Brian Trevor Hodges, Pacific Legal Foundation, Bellevue, WA, for Petitioner.
Tim Trohimovich, Futurewise, Seattle, WA, John T. Zilavy, Attorney at Law, Martha Patricia Lantz, Office of Atty. Gen. Lic. & Admin. Law Div., Olympia, WA, for Respondents.
Ann M. Gygi, Brian Corker Free, Hillis Clark Martin & Peterson, PS, Seattle, WA, Amicus Curiae on behalf of Clallam County.
Shelley E. Kneip, Kitsap County Prosecutor's Office, Port Orchard, WA, Amicus Curiae on behalf of Kitsap County.
*41 FAIRHURST, J.
¶ 1 Petitioners, Thurston County (County) and the Building Industry Association of Washington, Olympia Master Builders, and People for Responsible Environmental Policies (hereinafter collectively BIAW), seek review of a Court of Appeals ruling upholding the Western Washington Growth Management Hearings Board's (Board) determination that the County's 2004 updates to its comprehensive plan failed to conform to the Growth Management Act's (GMA), chapter 36.70A RCW, requirements regarding urban growth areas (UGA) and rural densities. The County asserts the Board lacked jurisdiction to hear Futurewise's[1] challenge to the County's updates and asserts the updates complied with the GMA.
¶ 2 We hold a party may challenge a county's failure to revise aspects of a comprehensive plan that are directly affected by new or recently amended GMA provisions if a petition is filed within 60 days after publication of the county's seven year update. A party may challenge a county's revisions or failures to revise its UGA designations when there is a change in the population projection, if a petition is filed within 60 days after publication of the county's 10 year update. We remand this case to the Board to determine whether a market factor was employed by the County in revising its UGAs and whether the County's designations were clearly erroneous. We also remand the case to the Board to determine whether it was clearly erroneous for the County to include densities greater than one dwelling unit per five acres in its rural element and whether the County provided for a variety of rural densities by the use of innovative zoning techniques.

I. STATEMENT OF THE CASE
¶ 3 The legislature enacted the GMA in 1990 to address concerns related to "uncoordinated and unplanned growth" in the State and "a lack of common goals expressing the public's interest in the conservation and the wise use of our lands." RCW 36.70A.010. The GMA provides a "framework" of goals and requirements to guide local governments who have "the ultimate burden and responsibility for planning." RCW 36.70A.3201. Great deference is accorded to a local government's decisions that are "consistent with the requirements and goals" of the GMA. Id. The GMA's goals include encouraging development in urban areas and reducing rural sprawl. RCW 36.70A.020(1), (2).
¶ 4 The GMA requires counties to develop a "`comprehensive plan,'" which sets out the "generalized coordinated land use policy statement" of the county's governing body. Former RCW 36.70A.030(4) (1997). Among other things, the comprehensive plan must designate a UGA "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). The plan also must include a rural element that provides for a variety of rural densities. Former RCW 36.70A.070(5)(b) (2004). The GMA recognizes regional differences and allows counties to consider local circumstances when designating rural densities so long as the local government creates a written record explaining how the rural element harmonizes the GMA requirements and goals. Former RCW 36.70A.070(5)(a).
¶ 5 The County's first comprehensive plan, following enactment of the GMA, was adopted in 1995.[2] The GMA requires counties to update their comprehensive plans every 7 years and review UGA designations every 10 years. Former RCW 36.70A.130(1)(a), (3) (2002). The County elected to perform these updates simultaneously in 2004.
¶ 6 In preparing the 2004 update, the County relied on population estimates for the cities within its boundaries developed by the Thurston Regional Planning Council based on the state Office of Financial Management's (OFM) population projections. The County also relied on the Thurston Regional *42 Planning Council, Buildable Lands Report for Thurston County (Sept.2002) (Buildable Lands Report) produced by the County.[3] The supply of lands available for future residential urban development throughout the county in 2000 was 18,789 acres, including vacant lots and underdeveloped plots. The County projected the demand for new residential urban land development will be 11,582 acres in 2025. After 25 years of population growth, 7,025 acres, or approximately 38 percent of available residential urban areas, will remain undeveloped.[4]
¶ 7 The County's overall UGA was slightly expanded in 2004 as a result of a revised UGA for the city of Tenino and a new UGA for the town of Bucoda. Tenino proposed in 2004, and the County accepted, the addition of 298 acres to the Tenino UGA to compensate for 295 acres that were transferred out of the UGA into conservation and family trusts. Prior to the 2004 revisions, the Tenino UGA included 505 buildable acres. The projected demand for new residential urban lands in Tenino in 2025 is 353 acres. According to the year 2000 estimates, approximately 30 percent of buildable Tenino UGA lands will remain undeveloped in 2025.
¶ 8 The buildable residential land supply in the town of Bucoda in 2000 was 81 acres.[5] Demand for new residential urban lands in Bucoda in 2025 is projected to be 30 acres, leaving 63 percent of the buildable residential lands unused. Bucoda proposed in 2004, and the County accepted, the creation of a UGA that would include 74 developable acres. The County accepted Bucoda's proposal "to accommodate growth projected by the city, provide economic opportunity and avoid intensifying impacts to a sensitive aquifer within existing city limits." Administrative Record (AR) at 697.
¶ 9 The County did not modify its rural density designations in 2004. The comprehensive plan indicates 399,264 acres are allocated for rural use in the county. Of this, 39.3 percent is designated natural resource use lands (designated agriculture, forestry, and mineral lands); 48.3 percent is rural resource and residential lands (residential density of one dwelling unit per five acres); 5.5 percent is rural and suburban residential lands (densities greater than one dwelling unit per two acres); 1.9 percent is public parks, trails, and preserves; 4.6 percent is military reservations; and 0.4 percent is rural commercial and industrial use. Actual zoning densities are set forth in the County's development regulations.
¶ 10 The County's development regulations provide for a number of innovative rural zoning techniques, including clustering and transfers of development rights. Thurston County Code (TCC) 20.30.020; TCC 20.30A.010, .020. The use of these innovative techniques is not specifically described in the County's comprehensive plan.
¶ 11 On November 22, 2004, the County adopted resolution 13234 modifying its comprehensive plan and ordinance 13235 modifying its development regulations. Futurewise *43 filed a petition with the Board challenging the County's updates. The Board determined the County's comprehensive plan failed to comply with the GMA by, among other things, "creating UGA boundaries that significantly exceed the projected demand for urban residential lands over the course of the 20-year planning horizon" and failing to provide for a variety of rural densities. AR at 2573.
¶ 12 The County sought direct review of the Board's decision with this court and the BIAW intervened. We transferred the case to the Court of Appeals, which affirmed the Board in part. Thurston County v. W. Wash. Growth Mgmt. Hearings Bd., 137 Wash.App. 781, 154 P.3d 959 (2007). The County and the BIAW petitioned for review, which we granted. Thurston County v. W. Wash. Growth Mgmt. Hearings Bd., 162 Wash.2d 1014, 178 P.3d 1033 (2008).

II. ISSUES
1. When a comprehensive plan is updated either every 7 years in accordance with former RCW 36.70A.130(1)(a) or when UGAs are reviewed every 10 years in accordance with former RCW 36.70A.130(3), does a growth management hearings board (GMHB) have jurisdiction to review the entire comprehensive plan?
2. Whether a UGA violates RCW 36.70A.110 when the supply of developable residential land in the UGA exceeds the projected demand for such land in 25 years by 38 percent.
3. Whether a comprehensive plan provides for a variety of rural densities in accordance with former RCW 36.70A.070(5)(b) when resource lands and densities greater than one dwelling unit per five acres are included in the rural element.

III. ANALYSIS

A. Standard of Review
¶ 13 The GMHBs adjudicate issues of GMA compliance and may invalidate noncompliant comprehensive plans. RCW 36.70A.280(1)(a), .302. Petitions challenging whether a comprehensive plan complies with the GMA "must be filed within sixty days after publication by the legislative bodies of the county or city." RCW 36.70A.290(2). A comprehensive plan is presumed valid, and "[t]he board shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). "To find an action `clearly erroneous,' the Board must have a `firm and definite conviction that a mistake has been committed.'" Lewis County v. W. Wash. Growth Mgmt. Hearings Bd., 157 Wash.2d 488, 497, 139 P.3d 1096 (2006) (quoting Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wash.2d 179, 201, 849 P.2d 646 (1993)). The party petitioning for review of a comprehensive plan has the burden of demonstrating the local government's actions failed to comply with the GMA. RCW 36.70A.320(2). A board must defer to a local government's decisions that are consistent with the GMA. RCW 36.70A.3201.
¶ 14 On review, we stand in the same position as a superior court reviewing a board's decision. Lewis County, 157 Wash.2d at 497, 139 P.3d 1096. Judicial review of board actions is governed by the Administrative Procedure Act, chapter 34.05 RCW. Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 233, 110 P.3d 1132 (2005). The party appealing a board's decision has the burden of demonstrating the invalidity of the board's actions. RCW 34.05.570(1)(a). A board's decision may be challenged on nine different bases.[6] RCW 34.05.570(3).
*44 ¶ 15 We review issues of law de novo. Lewis County, 157 Wash.2d at 498, 139 P.3d 1096. Substantial weight is accorded to a board's interpretation of the GMA, but the court is not bound by the board's interpretations. City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998). A board's order must be supported by substantial evidence, meaning there is "`a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" Id. (quoting Callecod v. Wash. State Patrol, 84 Wash.App. 663, 673, 929 P.2d 510 (1997)). "`On mixed questions of law and fact, we determine the law independently, then apply it to the facts as found by the agency.'" Lewis County, 157 Wash.2d at 498, 139 P.3d 1096 (quoting Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 8, 57 P.3d 1156 (2002)). Finally, it should be noted that from the beginning the GMA was "`riddled with politically necessary omissions, internal inconsistencies, and vague language.'" Quadrant Corp., 154 Wash.2d at 232, 110 P.3d 1132 (quoting Richard L. Settle, Washington's Growth Management Revolution Goes to Court, 23 SEATTLE U.L.REV. 5, 8 (1999)). The "`GMA was spawned by controversy, not consensus'" and, as a result, it is not to be liberally construed. Woods v. Kittitas County, 162 Wash.2d 597, 612 n. 8, 174 P.3d 25 (2007) (quoting Settle, supra, at 34).

B. When a comprehensive plan is updated either every 7 years in accordance with former RCW 36.70A.130(1)(a) or when UGAs are reviewed every 10 years in accordance with former RCW 36.70A.130(3), does a GMHB have jurisdiction to review the entire comprehensive plan?
¶ 16 The County's first comprehensive plan was adopted in 1995. Every seven years a county is required to take legislative action to update its comprehensive plan and development regulations "to ensure the plan and regulations comply" with the GMA. Former RCW 36.70A.130(1)(a). "Legislative action means the adoption of a resolution or ordinance following notice and a public hearing indicating at a minimum, a finding that a review and evaluation has occurred and identifying the revisions made, or that a revision was not needed and the reasons therefore." Id. Additionally, every 10 years a county must review and revise its UGA "to accommodate the urban growth projected to occur in the county for the succeeding twenty-year period." Former RCW 36.70A.130(3). The 7 year and 10 year reviews may be conducted simultaneously. Former RCW 36.70A.130(1)(a).

1. A party may challenge a county's failure to revise aspects of a comprehensive plan which are directly affected by new or recently amended GMA provisions following a seven year update
¶ 17 Futurewise argues it should be able to challenge all aspects of a comprehensive plan following a seven year update, regardless of whether a comprehensive plan is revised. The County argues a party may challenge revisions made during an update but may not challenge a county's failure to revise a comprehensive plan. The Court of Appeals agreed with Futurewise, holding a GMHB has jurisdiction to hear a challenge brought within 60 days of publication of a county's updates to its comprehensive plan, including those portions not amended during the update process. Thurston County, 137 Wash. App. at 796, 154 P.3d 959. The Court of Appeals reasoned any limitation on the type of challenge that may be brought against an update "would undermine the purpose of requiring periodic reviews." Id. at 794, 154 P.3d 959. The court recognized the importance of finality in land use decisions but noted the legislature, by requiring the seven year update, determined "the benefits to the public of keeping abreast of changes in the law outweigh the benefits of finality to landowners." Id. at 794-95, 154 P.3d 959. We disagree.
¶ 18 Former RCW 36.70A.130(1)(a) does not explicitly define which aspects of a comprehensive plan must be updated, nor does it delineate the scope of challenges that may be brought against a comprehensive plan. The GMA clearly does not require a county to reenact a new comprehensive plan every seven years. It simply mandates a county "review *45 and, if needed, revise its comprehensive land use plan and development regulations."[7] Former RCW 36.70A.130(1)(a). A county must review its entire comprehensive plan every seven years. However, the GMA does not explicitly require a county to revise every aspect of its comprehensive plan and we refuse to imply such an onerous requirement in the absence of an explicit GMA provision to the contrary.
¶ 19 We hold a party may challenge a county's failure to revise a comprehensive plan only with respect to those provisions that are directly affected by new or recently amended GMA provisions, meaning those provisions related to mandatory elements of a comprehensive plan that have been adopted or substantively amended since the previous comprehensive plan was adopted or updated, following a seven year update. This rule provides a means to ensure a comprehensive plan complies with recent GMA amendments, recognizes the original plan was legally deemed compliant with the GMA, and preserves some degree of finality.
¶ 20 The legislature intended for the update process to include an assessment of whether a comprehensive plan complies with recent amendments to the GMA. RCW 36.70A.070(9) ("[i]t is the intent that new or amended elements required after January 1, 2002, be adopted concurrent with the scheduled update provided in RCW 36.70A.130."). The update process "provides the vehicle for bringing plans into compliance with recently enacted GMA requirements and for recognizing changes in land usage or population. It creates no `open season' for challenges previously decided or time-barred." Gold Star Resorts, Inc. v. Futurewise, 140 Wash.App. 378, 390, 166 P.3d 748 (2007), petition for review filed, No. 80810-4 (Oct. 7, 2007). If a county fails to revise its comprehensive plan to comply with new or amended GMA requirements, a party must be able to challenge the comprehensive plan or GMA amendments would be essentially unenforceable. See Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County, 135 Wash.2d 542, 558-59, 958 P.2d 962 (1998) (a GMHB may consider whether a county's actions, or failure to act, comply with the GMA).
¶ 21 Limiting the scope of failure to revise challenges recognizes the original comprehensive plan was legally deemed GMA compliant. A comprehensive plan is presumed valid upon adoption, RCW 36.70A.320(1), and is conclusively deemed legally compliant if it is not challenged within 60 days. The seven year update does not strip the original comprehensive plan of its legal status as GMA compliant, and we will not presume the legislature intended such a drastic measure in the absence of statutory language to that effect. If the laws have not changed, the comprehensive plan remains GMA compliant.
¶ 22 Finally, limiting failure to revise challenges to those aspects of a comprehensive plan directly affected by new or substantively amended GMA provisions serves the public policy of preserving the finality of land use decisions. Finality is important because "[i]f there were not finality, no owner of land would ever be safe in proceeding with development of his property." Deschenes v. King County, 83 Wash.2d 714, 717, 521 P.2d 1181 (1974), overruled in part by Clark County Pub. Util. Dist. No. 1 v. Wilkinson, 139 Wash.2d 840, 991 P.2d 1161 (2000). The legislature recognized the importance of finality in limiting the time period for challenging a comprehensive plan to 60 days. RCW 36.70A.290(2). If we were to allow a party to challenge every aspect of a comprehensive plan for GMA compliance every seven years, the floodgates of litigation initially closed by the 60-day appeal period would be reopened. Aspects of plans previously upheld on appeal could be subjected to a new barrage of challenges because a party could argue it is challenging a county's failure to update a provision, rather than reasserting its claim against the original plan. See, e.g., Thurston County, 137 Wash.App. at 798-800, 154 P.3d 959 (allowing Futurewise's challenge to the County's UGA designations despite an earlier board decision upholding part of the County's UGA because the new challenge is based on the 2004 update). Because the legislature has not condoned such a result, *46 we choose to limit challenges for failures to update comprehensive plans to those provisions that are directly affected by new or recently amended GMA provisions.
¶ 23 In this case, the County did not modify its rural density designations in 2004.[8] The law regarding rural elements changed in 1997. LAWS OF 1997, ch. 429, §§ 3, 7. The GMA now permits limited areas of more intensive rural development (LAMIRDs) to be included in the rural element. Former RCW 36.70A.070(5)(d). The Board determined densities greater than one dwelling unit per five acres constitute "`more intensive rural development'" and, as such, must be designated as LAMIRDs. AR at 2570. The Board had jurisdiction to consider the LAMIRD issue because there was a substantive change in the law regarding mandatory comprehensive plan elements.
¶ 24 The next question is whether the Board had jurisdiction to consider whether the County's comprehensive plan provided for a variety of rural densities when the law regarding this particular provision was not substantively amended. The rural element provision originally stated, "[t]he rural element shall permit land uses that are compatible with the rural character of such lands and provide for a variety of rural densities." LAWS OF 1990, 1st Ex.Sess., ch. 17, § 7(5). Although the phrase "provide for a variety of rural densities" has not changed since the County adopted its first comprehensive plan, the surrounding requirements governing which lands may be included in the rural element and the definitions of rural development and rural character were adopted or amended in 1997. LAWS OF 1997, ch. 429, §§ 3, 7. Because these amendments substantively affected which lands may be included in a rural element, such as designations of LAMIRDs, Futurewise may challenge whether the County's 2004 update complies with the new provisions and, if it does not, whether the remaining compliant land designations provide for a variety of rural densities.

2. A party may challenge a county's failure to revise its UGA designations during a 10 year update only if the OFM population projection for the county changed
¶ 25 A party may challenge a county's failure to revise its UGA designations during a 10 year update only if there is a different OFM population projection for the county. At least every 10 years a county must review its UGA designations. Former RCW 36.70A.130(3). "The county comprehensive plan designating urban growth areas... shall be revised to accommodate the urban growth projected to occur in the county for the succeeding twenty-year period." Id. The OFM 20 year population projection is updated "[a]t least once every five years or upon the availability of decennial census data, whichever is later." RCW 43.62.035. If the urban growth projection changes, a county must revise its comprehensive plan. Former RCW 36.70A.130(3). If the county fails to revise its plan, a party may challenge whether the UGA accommodates the most recent OFM population projection.
¶ 26 If a county amends a comprehensive plan, the amendment must comply with the GMA and may be challenged within 60 days of publication of the amendment adoption notice. Former RCW 36.70A.030(1); former RCW 36.70A.130(1)(b); RCW 36.70A.290(2). The County asserts Futurewise's challenge was timely only as to the revisions to the Tenino and Bucoda UGAs and, thus, the size of the overall UGA in the county cannot be challenged because it was essentially unchanged in 2004. The County fails to recognize the changes to the two individual UGAs modified the overall UGA size and, even if the overall UGA size was not changed, the population projection was updated. In this case, the County's UGA boundaries were amended in 2004 and, consequently, are subject to challenge.

*47 C. Whether a UGA violates RCW 36.70A.110 when the supply of developable residential land in the UGA exceeds the projected demand for such land in 25 years by 38 percent
¶ 27 A comprehensive plan must designate a UGA "within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). A county's comprehensive plan may include a number of different UGAs, which must include all cities and "may include territory that is located outside of a city only if such territory already is characterized by urban growth." Id. Additionally, the UGA must include "areas and densities sufficient to permit the urban growth that is projected to occur in the county or city for the succeeding twenty-year period," as determined by OFM's growth management population projection. RCW 36.70A.110(2). A UGA boundary may be expanded beyond the area sufficient to accommodate the projected population growth by a "reasonable land market supply factor." Id. "In determining this market factor, cities and counties may consider local circumstances. Cities and counties have discretion in their comprehensive plans to make many choices about accommodating growth." Id. In designating a UGA, a county must consult with the cities located within its boundaries. Id. If a city and county cannot agree, the county may designate a UGA but must justify its decision in writing. Id.
¶ 28 UGA boundaries must be reviewed at least every 10 years. Former RCW 36.70A.130(3). The comprehensive plan must be "revised to accommodate the urban growth projected to occur in the county for the succeeding twenty-year period." Id.
¶ 29 The County updated its comprehensive plan and UGA designations in 2004. In updating the UGA designations, the County relied on population estimates for the cities within its boundaries developed by the Thurston Regional Planning Council and the Buildable Lands Report produced by the County in accordance with RCW 36.70A.215.[9] The County projected, based on OFM population estimates, the demand for new residential urban development throughout the county will be 11,582 acres in 2025. The supply of lands available for future residential urban development throughout the county in 2000 was 18,789 acres. After 25 years of population growth, 7,025 acres, or approximately 38 percent of available residential urban areas, will remain undeveloped. The Buildable Lands Report concluded, "[a] sufficient residential land supply exists to accommodate 25 years of projected population growth in all jurisdictions within Thurston County." AR at 2378.
¶ 30 In 2004, the County modified the size of the UGA for the city of Tenino and created a UGA for the town of Bucoda.[10] The Tenino UGA was expanded beyond the city boundaries in 1994 because more land was required to accommodate future growth due to local circumstances. Most of the vacant land within the city is located between existing homes, and the County's general minimum lot size is insufficient to support individual septic systems for each dwelling unit. As of 2000, the buildable residential land supply in the Tenino UGA was 505 acres. At some point, 295 acres were transferred out of the UGA into conservation and family trusts. As part of the 2004 update process, Tenino and the County approved the inclusion of an additional 298 acres into the UGA to compensate for the acreage transferred out of the UGA. The demand for land in Tenino in 2025 is projected to be 353 acres, leaving 30 percent of buildable UGA lands unused.
¶ 31 The buildable residential land supply in the town of Bucoda in 2000 was 81 acres. Demand for urban lands in Bucoda in 2025 is projected to be 30 acres, leaving 63 percent of the buildable lands unused. The town determined a UGA should be designated because *48 "[f]ull residential build-out is unlikely... due to market factors (30% of vacant land on the hillside is owned by one person who has not been interested in selling) and the fact that much of the infill properties in the main part of town include very small lots." AR at 1510. Bucoda proposed in 2004, and the County accepted, the creation of a UGA containing 74 developable acres. The County justified the addition of such lands as necessary "to accommodate growth projected by the city, provide economic opportunity and avoid intensifying impacts to a sensitive aquifer within existing city limits." AR at 697.
¶ 32 Futurewise asserts the County's failure to reduce the overall size of its UGAs and its adoption of the amendments to the Tenino and Bucoda UGAs violate the GMA.[11] The Board held the County failed to comply with RCW 36.70A.110 because the UGA boundaries continue to provide "a significant excess of land supply over projected demand for such urban lands through 2025." AR at 2540. The Board found the County's comprehensive plan failed to identify whether a market supply factor was used and failed to provide justifications for the UGA expansions in Tenino and Bucoda. The Board noted the County could not employ a reasonable market supply factor because unbuildable lands, such as critical areas, were accounted for in the Buildable Lands Report's determination of the supply of residential land.
¶ 33 The Court of Appeals affirmed the Board's ruling, relying on Diehl v. Mason County, 94 Wash.App. 645, 972 P.2d 543 (1999). In Diehl, the Court of Appeals ruled the size of a UGA must not exceed the amount of land necessary to support the maximum population forecasted by OFM. Id. at 653-54, 972 P.2d 543. If a county enlarges its UGA "to account for a `reasonable land market supply factor,'" according to Diehl, "it must also explain why this market factor is required and how it was reached." Id. at 654, 972 P.2d 543 (quoting RCW 36.70A.110(2)). Applying these principles, the Court of Appeals in this case held the County failed to identify whether it was employing a market supply factor or provide justification for the factor used. Thurston County, 137 Wash.App. at 803-04, 154 P.3d 959.
¶ 34 The size of a UGA must be "[b]ased upon" an OFM projection and a county must include "areas and densities sufficient to permit the urban growth" projected to occur over the next 20 years. RCW 36.70A.110(2). While the statute explicitly states the UGA must be large enough to accommodate the projected population increase, it does not specifically state the projected population limits the amount of land that may be designated as urban. In Diehl, the Court of Appeals held an OFM projection constitutes both the minimum and maximum size of a UGA. 94 Wash.App. at 653, 972 P.2d 543. The court reasoned that although the GMA does not explicitly restrict the size of a UGA, "[o]ne of the goals of the GMA is to `[r]educe the inappropriate conversion of undeveloped land into sprawling, low-density development.'"[12]Id. (second alteration in original) (quoting RCW 36.70.020(2)). If the size of a UGA is not limited, rural sprawl could abound.[13]Id. Thus, although the GMA *49 does not explicitly limit the size of a UGA, to give meaning to the market supply factor provision and in light of the GMA goal of reducing sprawl, we hold a county's UGA designation cannot exceed the amount of land necessary to accommodate the urban growth projected by OFM, plus a reasonable land market supply factor.
¶ 35 The Court of Appeals reasoned a county must explain its justifications for employing a land market supply factor and defend the reasonableness of such a factor in a comprehensive plan. Thurston County, 137 Wash.App. at 803-04, 154 P.3d 959; see also Diehl, 94 Wash.App. at 654, 972 P.2d 543. The GMA does not support this ruling. A comprehensive plan is presumed valid upon adoption, and the petitioner has the burden of demonstrating the plan fails to comply with the GMA. RCW 36.70A.320(1), (2). The GMA does not require a county to explicitly identify a land market supply factor or provide justifications for adopting such a factor in the comprehensive plan. A county is required to justify its UGA designations if it fails to reach an agreement with a city. RCW 36.70A.110(2). No analogous provision requiring a county to explicitly identify and justify a UGA boundary adopted in a joint plan with a city exists. To require a county to justify its use of a land market supply factor is to presume the UGA designation is invalid and to place the burden on a county to justify its actions.
¶ 36 Assuming the County's UGA was not rejected on its face because it failed to identify and justify its land market supply factor, it is necessary to determine whether the land market supply factor employed was reasonable. "[A] market factor represents the estimated percentage of net developable acres contained within a UGA that, due to idiosyncratic market forces, is likely to remain undeveloped over the course of the twenty-year planning cycle." Brent D. Lloyd, Accommodating Growth or Enabling Sprawl? The Role of Population Growth Projections in Comprehensive Planning under the Washington State Growth Management Act, 36 Gonz. L.Rev. 73, 118 (2001). Beginning in 1995, the GMHBs adopted 25 percent as the bright-line test for determining whether a market supply factor is reasonable. Bremerton v. Kitsap County, No. 95-3-0039, 1995 WL 903165, 1995 GMHB LEXIS 384, at *87 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. and Order Oct. 6, 1995) (holding market supply factors of 25 percent or less are presumed reasonable, while factors exceeding 25 percent will be subject to increased scrutiny). However, a GMHB cannot create a bright-line factor because "the growth management hearings boards do not have authority to make `public policy' even within the limited scope of their jurisdictions, let alone to make statewide public policy." Viking Props., Inc. v. Holm, 155 Wash.2d 112, 129, 118 P.3d 322 (2005).
¶ 37 Once a petitioner challenges the size of a county's UGA, the county may explain whether the difference between the supply and demand is due to a land market supply factor or other circumstances. If the county asserts a land market supply factor was used in designating the UGA boundaries, the petitioner may argue the factor employed was clearly erroneous and unreasonable based on the facts in the record. No bright-line rule regarding the reasonableness of a land market supply factor may be used by the GMHBs. Viking Props., 155 Wash.2d at 129, 118 P.3d 322. Depending on local circumstances, 15 percent may be reasonable in one county, while 40 percent may be reasonable in another. A GMHB may not reject a UGA simply because the land market supply factor used is greater than 25 percent nor may they subject higher percentages to greater scrutiny. Instead, in determining whether a market supply factor is reasonable, a board must recognize counties have great discretion in making choices about accommodating growth and the land market supply factor may be based on local circumstances. RCW 36.70A.110(2). A board shall not find a county's use of a land market supply factor unreasonable unless it is shown to be clearly erroneous in light of the entire record. RCW 36.70A.320(2).
¶ 38 In this case, there is some question as to whether the County used a 38 percent land market supply factor or if 38 percent simply represents the excess supply *50 of buildable residential lands.[14],[15] On remand, the Board should determine whether a land market supply factor was used by the County and, if so, whether the factor was clearly erroneous based on all of the evidence in the record. The County should be allowed to argue, based on evidence in the record, the land market supply factor used is reasonable. The Board shall not apply a bright-line rule regarding what constitutes a reasonable land market supply factor. If the Board finds a land market supply factor was not used, the Board must determine whether the UGA designations were clearly erroneous after taking into account local circumstances and deferring to the County's discretion in making choices to accommodate future growth.

D. Whether a comprehensive plan provides for a variety of rural densities in accordance with former RCW 36.70A.070(5)(b) when resource lands and densities greater than one dwelling unit per five acres are included in the rural element
¶ 39 A comprehensive plan must "include a rural element including lands that are not designated for urban growth, agriculture, forest, or mineral resources." Former RCW 36.70A.070(5). "The rural element shall permit rural development, forestry, and agriculture in rural areas." Former RCW 36.70A.070(5)(b). Additionally, the rural element must "provide for a variety of rural densities," which may be accomplished by innovative techniques such as "clustering, density transfer, design guidelines, [or] conservation easements ... that will accommodate appropriate rural densities and uses that are not characterized by urban growth and that are consistent with rural character." Id. A county has a great amount of discretion to employ various techniques to achieve a variety of rural densities. Whidbey Envtl. Action Network v. Island County, 122 Wash. App. 156, 167, 93 P.3d 885 (2004). A county may consider local circumstances in determining rural densities but must explain in writing how the rural element harmonizes the goals and meets the requirements of the GMA. Former RCW 36.70A.070(5)(a).
¶ 40 The County's comprehensive plan provides:
Rural area residential densities will commonly be one dwelling unit or less per five acres. There may be areas with higher densities, some as high as two units per acre where there are existing clusters of half-acre lots or in higher density resort-residential areas adjacent to water bodies. Areas of four units per acre are located only in those locations where this density already exists.
AR at 774. Actual zoning densities are found in the TCC. The comprehensive plan indicates 399,264 acres are allocated for rural use *51 in the county. Of this, 39.3 percent is designated natural resource use lands (designated agriculture, forestry, and mineral resource lands); 48.3 percent is rural resource and residential lands (residential density of one dwelling unit per five acres); 5.5 percent is rural and suburban residential lands (densities greater than one dwelling unit per two acres); 1.9 percent is public parks, trails, and preserves; 4.6 percent is military reservations; and 0.4 percent is rural commercial and industrial use. The County's zoning regulations provide for planned residential developments, TCC 20.30.020, and clustering, TCC 20.30A.020, in rural residential areas.[16]
¶ 41 The Board determined agricultural and forest resource lands are not part of a rural element and, as such, the presence of such zoning densities does not contribute to a variety of rural densities. The Board concluded zones permitting densities greater than one dwelling unit per five acres would not be considered rural densities unless designated as limited areas of more intensive rural development, which they were not. Thus, the Board refused to consider these zoning densities for the purpose of deciding whether the County's comprehensive plan provided for a variety of rural densities. Additionally, the Board found the comprehensive plan itself did not include a description of how innovative techniques were used to achieve a variety of rural densities.[17] The Board concluded the County failed to provide a variety of rural densities in its rural element as required by former RCW 36.70A.070(5)(b) because the only remaining density, under the Board's rulings, was one dwelling unit per five acres.
¶ 42 The Court of Appeals affirmed the Board's ruling, in part, holding designated resource lands are not part of a rural element and densities greater than one dwelling unit per five acres are not rural densities. Thurston County, 137 Wash.App. at 806-08, 154 P.3d 959. The court reversed the Board's determination that the County failed to provide for a variety of rural densities through innovative zoning techniques because the Board failed to presume the validity of the County's comprehensive plan when it required the County to describe its innovative techniques in the comprehensive plan. Id. at 809, 154 P.3d 959.
¶ 43 As to the first subissue, natural resource areas, including agricultural and forestry lands of long-term commercial significance, are not included in a rural element. A comprehensive plan must include a rural element "including lands that are not designated for urban growth, agriculture, forest, or mineral resources."[18] Former RCW 36.70A.070(5) (emphasis added). Natural resource lands are not a part of the County's rural element and, thus, do not contribute to a variety of rural densities within the rural element.
*52 ¶ 44 The second subissue is whether densities greater than one dwelling unit per five acres may be considered rural, even if such densities should be designated LAMIRDs.[19],[20] The Board recognized densities greater than one unit per five acres are "generally deemed to promote sprawl" and concluded the higher densities in the County's comprehensive plan are "too intensive for rural areas." AR at 2548, 2553. Additionally, the Board's decision suggests lands designated as LAMIRDS, or lands which could potentially quality as LAMIRDs, may not be considered part of a rural element. The designation of lands as LAMIRDs does not foreclose the possibility that such lands may be included in a county's rural element.
¶ 45 Since 1995, GMHBs have utilized bright-line standards to distinguish between urban and rural densities.[21]Thurston County, 137 Wash.App. at 806, 154 P.3d 959 ("[t]he Board considers a density of not more than one dwelling unit per five acres to be rural.").[22] The GMHB, as a quasi-judicial agency, lacks the power to make bright-line rules regarding maximum rural densities. Viking Props., 155 Wash.2d at 129-30, 118 P.3d 322. We hold a GMHB may not use a bright-line rule to delineate between urban and rural densities, nor may it subject certain densities to increased scrutiny.
¶ 46 The legislature did not specifically define what constitutes a rural density. Instead, it provided local governments with general guidelines for designating rural densities. A rural density is "not characterized by urban growth" and is "consistent with rural character."[23] Former RCW *53 36.70A.070(5)(b). Whether a particular density is rural in nature is a question of fact based on the specific circumstances of each case. In this case, the common rural residential density in the county is one dwelling unit per five acres or less according to the comprehensive plan. Higher densities may be present "where there are existing clusters of half-acre lots or in higher density resort-residential areas adjacent to water bodies." AR at 774. Densities of four dwellings per acre are allowed only where such densities already exist. Only 5.5 percent of rural acreage is designated at densities higher than one dwelling per five acres. The comprehensive plan explains the purpose, definition, characteristics, and local guidelines for each zoning density. The Board should not have rejected these densities based on a bright-line rule for maximum rural densities, but must, on remand, consider local circumstances and whether these densities are not characterized by urban growth and preserve rural character.
¶ 47 Finally, the GMA does not dictate a specific manner of achieving a variety of rural densities. Whidbey Envtl. Action Network, 122 Wash.App. at 167, 93 P.3d 885. Local conditions may be considered and innovative zoning techniques employed to achieve a variety of rural densities. Former RCW 36.70A.070(5)(b). In this case, the Court of Appeals reversed the Board's holding that the County's innovative techniques did not achieve a variety of rural densities. The use of innovative techniques may be sufficient, regardless of the underlying zoning classifications, to achieve a variety of rural densities. Even if the Board determines, on remand, that the County failed to provide for a variety of rural densities through its various zoning classifications, the County may have achieved a variety of rural densities through the use of innovative zoning techniques. We remand this issue to the Board for a determination of whether the County's innovative zoning techniques as set forth in its development regulations provide for a variety of rural densities.
¶ 48 We remand the variety of rural densities issue to the Board to determine whether, in this particular case, it was clearly erroneous for the County to include densities greater than one dwelling unit per five acres in its rural element and whether the County's innovative zoning techniques set forth in its development regulations provide for a variety of rural densities.

IV. CONCLUSION
¶ 49 We affirm the Court of Appeals in part and reverse in part. We hold a party may challenge a county's failures to revise aspects of a comprehensive plan that are directly affected by new or recently amended GMA provisions if a petition is filed within 60 days after publication of the county's seven year update. We hold a party may challenge a county's failure to revise its UGA designations following a 10 year update only if there is a different OFM population projection for the county. We reverse the Court of Appeals' holding that a county must identify and justify the use of a land market supply factor in its comprehensive plan. We remand the case to the Board to determine whether a land market supply factor was used and whether, based on local circumstances, the County's UGA designations were clearly erroneous. We reverse the Court of Appeals' ruling that densities greater than one dwelling unit per five acres cannot be considered in determining whether a comprehensive plan provides for a variety of rural densities. We remand the case to the Board to consider whether the various densities identified by the County in the rural element and/or the use of innovative zoning techniques are sufficient to achieve a variety of rural densities.
WE CONCUR: GERRY L. ALEXANDER, C.J., CHARLES W. JOHNSON, BARBARA A. MADSEN, RICHARD B. SANDERS, TOM CHAMBERS, SUSAN OWENS, JAMES M. JOHNSON, DEBRA L. STEPHENS, JJ.
NOTES
[1] Futurewise was formerly known as 1000 Friends of Washington.
[2] The County's original comprehensive plan was adopted in 1975 and revised in 1988. The year 1995 was the first time a comprehensive plan was adopted after the County was required to plan under the GMA. RCW 36.70A.040(1), (3).
[3] The Buildable Lands Report fulfills the requirements of RCW 36.70A.215, which requires counties to establish review and evaluation programs. An evaluation program must include a determination of "whether there is sufficient suitable land to accommodate the countywide population projection established" by OFM. RCW 36.70A.215(3)(a). In making this determination, the County designated residential lands into the categories of undevelopable, buildable, and developed. Lands designated as critical areas, open space, selected public lands and facilities, resource lands, and cemeteries were categorically excluded from the land supply. The land supply includes buildable lands and developed lands that are likely to be redeveloped.
[4] These estimates were made in 2002 and do not take into account modifications made to the County's UGA in 2004. Futurewise challenges the revisions to the UGAs for Tenino and Bucoda as well as the County's failure to reduce its UGAs in 2004 when, in Futurewise's opinion, having a residential land supply 38 percent greater than the estimated demand in 2025 violates the GMA.
[5] Bucoda did not have a UGA in 2000 when the County calculated the buildable residential land supply. Within the town limits, Bucoda estimated 14 acres were available for residential development in 2002, contrary to the County's estimate of 81 acres being available for residential development. Bucoda opined the County's 2000 projections were inaccurate. The Board used the numbers from the County's comprehensive plan and the Board's finding was not challenged on appeal, so we continue to use the County's estimate of the land supply for the town of Bucoda in 2000.
[6] The County claims the Board's order violates the constitution as applied, the Board lacked authority to issue the order, the Board erroneously interpreted and applied the law, the order is not supported by substantial evidence, and the order is arbitrary or capricious. The County addresses only whether the Board exceeded its authority and erroneously interpreted or applied the law in its briefing.
[7] In addition, the update process "shall include, but is not limited to, consideration of critical area ordinances" and population forecasts. Former RCW 36.70A.130(1)(a).
[8] The County modified the rural area designation section of its comprehensive plan in 2004. These modifications include the addition of a new purpose to reflect changes to former RCW 36.70A.030(14) (1997), organizational changes, and technical edits. See AR at 773-92. The revisions did not substantively affect the rural designations at issue.
[9] OFM projects a reasonable range of population growth for a county. RCW 43.62.035. In determining the population allocation for Thurston County, the Thurston Regional Planning Council adopted the OFM low population growth forecast for 1999 to 2001 and the medium growth forecast for 2002 to 2025.
[10] UGAs surrounding incorporated cities are designated in joint plans between the County and the respective cities, rather than in the comprehensive plan itself.
[11] Each individual UGA must include areas sufficient to meet the demand of the population allocated to that area. The allocation of a county's OFM projected population to the various cities and rural areas within the county is in the county's discretion. Brent D. Lloyd, Accommodating Growth or Enabling Sprawl? The Role of Population Growth Projections in Comprehensive Planning under the Washington State Growth Management Act, 36 Gonz. L.Rev. 73, 107-09(2001).
[12] The Court of Appeals considered WAC 365-195-335(3)(e)(v), which provides a UGA "should encompass a geographic area which matches the amount of land necessary to accommodate likely growth." However, the Court of Appeals was mistaken because this particular subsection applies to the analysis a city should engage in before proposing the boundaries of a UGA but does not apply to a county's designation process which is governed by other provisions. Compare WAC 365-195-335(3)(c) (designating which processes a city should engage in before proposing a UGA), with WAC 365-195-335(3)(g) (designating which processes a county should engage in before designating a UGA).
[13] "Oversized UGAs are perhaps the most egregious affront to the fundamental GMA policy against urban sprawl, and it is this policy that the UGA requirements, more than any other substantive GMA mandate, are intended to further." Lloyd, supra, at 105.
[14] Before the Board, Allen Miller, counsel for the County, stated that he did not believe 38 percent represented a market supply factor, but simply was the amount of buildable land supply "left over" in 25 years. Report of Proceedings (June 16, 2005) at 159. "`An admission by an attorney to be binding upon his client must be distinct and formal, and made for the express purpose of dispensing with the formal proof of some fact at the trial.'" Dodge v. Stencil, 48 Wash.2d 619, 622, 296 P.2d 312 (1956) (quoting State v. Wheeler, 93 Wash. 538, 541, 161 P. 373 (1916)). Miller's equivocal statement is not binding on the County. Additionally, the Board found "[n]owhere in the County's comprehensive plan is it indicated that a 38 percent market factor was utilized." AR at 2572. A comprehensive plan need not identify whether a market supply factor was employed in designating a UGA, so the Board's finding that the comprehensive plan did not identify a market supply factor is not determinative of whether such a factor was used.
[15] The BIAW argues the Board erred in designating 38 percent as the difference between urban land supply and demand. The Buildable Lands Report included a 20 and 25 year forecast from 2000. The Board relied on the percent of buildable lands in urban areas remaining in 2025, which will be 38 percent of the buildable residential land supply in 2000. Former RCW 36.70A.130(3) requires UGA designations to be sufficient to accommodate 20 years of urban growth. Thus, the BIAW argues, the Board should have subtracted five years of development from the land supply number before calculating the difference between supply and demand. Futurewise argues the baseline for both supply and demand was the year 2000, so both the supply and demand would need to be reduced by five years of growth. The Court of Appeals refused to address this issue because the statistics were provided by the County and none of the parties challenged the number before the Board. Thurston County, 137 Wash.App. at 805, 154 P.3d 959. We agree.
[16] The planned residential development regulation is intended to, inter alia, "[e]ncourage imaginative design and the creation of permanent open space by permitting greater flexibility in zoning requirements," "[p]reserve or create environmental amenities superior to those generally found in conventional developments," and "[p]reserve to the greatest possible extent, the natural characteristics of the land." TCC 20.30.010(1), (2), (4). The clustering regulation is intended "to provide for residential development in rural areas in a way that maintains or enhances the county's rural character; is sensitive to the physical characteristics of the site; retains large, undivided parcels of land that provide opportunities for compatible agricultural, forestry and other rural land uses; protects sensitive environmental resources; facilitates creation of open space corridors; and minimizes impacts of road and utility systems." TCC 20.30A.010.
[17] While the use of innovative techniques was not specifically described in the County's comprehensive plan, the County stated, during the 2004 update process, the comprehensive plan provided for a variety of rural densities "through the use of urban growth areas, rural-density zoning, critical area and shoreline ordinances, open space tax program incentives, purchase of development rights and transfer of development rights programs, designation of forestry and agricultural lands, cluster development ... and other innovative programs." AR at 695.
[18] Although there is a difference between a "rural element" and a "rural density" under the statute, the provision in question states "[t]he rural element shall provide for a variety of rural densities." Former RCW 36.70A.070(5)(b). Even if natural resource lands were rural densities, they are not included within the rural element.
[19] The County conceded densities greater than one dwelling unit per five acres are not rural during oral argument before the Board. Whether a particular density is rural in nature is a question of fact based on the specific circumstances of each case. Whether a bright-line rule regarding what constitutes a rural density exists is a question of law. This court is not bound by a counsel's erroneous concession concerning a question of law. State v. Knighten, 109 Wash.2d 896, 902, 748 P.2d 1118(1988).
[20] Although the Board did not explicitly adopt a five acre bright-line rule, such a rule was implicit in its decision because of the way the issue regarding rural densities was framed. The Board framed the issue as to whether the County's comprehensive plan failed to comply with the GMA by allowing "development at densities of greater than one unit per five acres when this board has determined that such densities fail to comply with the GMA." AR at 2546.
[21] See Bremerton, 1995 GMHB LEXIS 384, at *102 (adopting a bright-line urban density of a minimum of four dwelling units per acre); Vashon-Maury v. King County, No. 95-3-0008, 1995 WL 903209, 1995 GMHB LEXIS 428, at *149 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Final Dec. and Order Oct. 23, 1995) (holding densities of one dwelling unit per 10 acres or less is rural and greater densities are subject to increased scrutiny); Yanisch v. Lewis County, No. 02-2-0007c, 2002 WL 31863235, 2002 GMHB LEXIS 66, at *9 (W. Wash. Growth Mgmt. Hr'gs Bd. Final Dec. and Order Dec. 11, 2002) (densities greater than one dwelling unit per five acres are not rural). But see Citizens for Good Governance v. Walla Walla County, No. 05-1-0013, 2006 WL 2415825, 2006 GMHB LEXIS 69, at *28 (E. Wash. Growth Mgmt. Hr'gs Bd. Final Dec. and Order June 15, 2006) (noting bright-line factors may not be employed by a GMHB after Viking Properties).
[22] The Court of Appeals stated, "[t]he Supreme Court has referred to a density of one dwelling unit per live acres as `a decidedly rural density.'" Thurston County, 137 Wash.App. at 806 n. 15, 154 P.3d 959 (quoting Skagit Surveyors & Eng'rs, 135 Wash.2d at 571, 958 P.2d 962). This is incorrect. The cited provision is found in the dissenting opinion in Skagit Surveyors & Engineers, 135 Wash.2d at 571, 958 P.2d 962. To the contrary, we have rejected any bright-line rule delineating between urban and rural densities. Viking Props., 155 Wash.2d at 129-30, 118 P.3d 322.
[23] "`Rural character'" includes lands:

(a) In which open space, the natural landscape, and vegetation predominate over the built environment;
(b) That foster traditional rural lifestyles, rural-based economies, and opportunities to both live and work in rural areas;
(c) That provide visual landscapes that are traditionally found in rural areas and communities;
(d) That are compatible with the use of the land by wildlife and for fish and wildlife habitat;
(e) That reduce the inappropriate conversion of undeveloped land into sprawling, low-density development;
(f) That generally do not require the extension of urban governmental services; and
(g) That are consistent with the protection of natural surface water flows and ground water and surface water recharge and discharge areas.
Former RCW 36.70A.030(14).