## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| PAUL STICKNEY and RICHARD BIRGH, | ) ) ) |
| | ) No. 78518-4-I |
| Appellants, | ) ) DIVISION ONE |
| v. | ) ) |
| | ) PUBLISHED OPINION |
| CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, an environmental board, | ) ) ) ) |
| Respondent. | ) FILED: November 25, 2019 ) |

LEACH, J. — Paul Stickney and Richard Birgh appeal the superior court's affirmation of a Central Puget Sound Growth Management Hearings Board (GMHB) order. They challenge a decision that the City of Sammamish's amended housing element brought its 2015 comprehensive plan into compliance with the Growth Management Act (GMA).[1]

Sammamish analyzed extensive demographic, economic, and housing data for Sammamish, King County, and East King County. Using this analysis, Sammamish adopted an amended housing element for its comprehensive plan that identified its unmet housing need as housing units affordable for the three

---

[1] Ch. 36.70A RCW.

lowest household income levels defined by the King County Countywide Planning Policies (CPPs). The amended housing element described the current inventory and housing need for affordable housing at these levels. It also identified the percentage and number of housing units the city planned to develop by 2035 to address the need at these three income levels.

These values represented an inventory and analysis of existing and projected housing needs and provided the number of units necessary to manage projected growth. And the amended housing element coordinates and is consistent with King County's CPPs and the Puget Sound Regional Council's (PSRC) Multicounty Planning Policies (MPPs). So Sammamish's amended housing element does not violate the GMA. We affirm.

## FACTS

In October 2015, the city of Sammamish adopted a comprehensive plan.[2] This comprehensive plan included a housing element required by the GMA.[3] The housing element contained a 2015-2035 growth target for Sammamish of 4,640 housing units. It identified countywide need for households in the lowest three income categories based on area median income (AMI) as defined in the CPPs.[4] The housing element described the proportional need across King

---

[2] City of Sammamish Ordinance O2015-396.
[3] RCW 36.70A.070(2).
[4] Very low income (30% and below AMI), low-income (30-50% AMI), and moderate income households (50-80% AMI).

County as making 12% of the total housing affordable for very low income households, 12% affordable for low income households, and 16% percent affordable for moderate income households. Sammamish included a housing analysis adopted from A Regional Coalition for Housing (ARCH) housing analysis for its member cities. The analysis presented extensive economic, demographic, and housing data for multiple years at the city, regional, and countywide level.

Stickney and Birgh appealed Sammamish's adoption of the housing element to the GMHB.[5] In July 2016, the GMHB decided that Sammamish's comprehensive plan violated the GMA because it failed "to make adequate provisions for existing and projected needs of all economic segments of the community, contrary to RCW 36.70A.070(2) and RCW 36.70A.020(4)." It also concluded that the housing element was "inconsistent with the Countywide Planning Policies for King County because [it] failed to address the City's 'share' of countywide housing needs, contrary to RCW 36.70A.100 and RCW 36.70A.210(1)." The GMHB issued a compliance order.

In December 2016, the Sammamish City Council amended the housing element to bring it into compliance with the GMHB's order.[6] The amended housing element identified Sammamish's current and projected needs for

---

[5] Stickney and Birgh also appealed the development regulations and dwelling unit limit Sammamish established for its Town Center Plan. The Town Center Plan is not a subject of their appeal before this court.

[6] City of Sammamish Ordinance No. O2016-426.

housing affordable to the moderate, low, and very low income households. It included the percentage of the total housing inventory available and needed for each of these categories. It identified the number of household units the city planned to add by 2035 and stated that sufficient land existed within the city to meet this goal. To address the need for additional affordable housing, it identified the number of housing units affordable to very low income, low income, and moderate income households it planned to add by 2035.

On March 10, 2017, after briefing and oral argument, the GMHB decided that Sammamish's amended housing element complied with the GMA. Stickney and Birgh appealed this decision to the superior court, which affirmed the GMHB's decision. Stickney and Birgh appeal.

## ANALYSIS

Stickney and Birgh claim that Sammamish's amended housing element does not satisfy the GMA and is inconsistent with King County's CPPs and PSRC's MPPs. We disagree.

The legislature authorized the GMHB to determine a petition challenging whether a city plan complies with the GMA.[7] It has the power to invalidate a noncompliant comprehensive plan.[8] The GMHB must presume a plan is valid.[9]

---

[7] RCW 36.70A.280.
[8] RCW 36.70A.302; Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd., 164 Wn.2d 329, 340, 190 P.3d 38 (2008).
[9] RCW 36.70A.320.

When it evaluates a city plan, it defers to that city's decisions that are consistent with the GMA.[10] The plan challenger has the burden of showing that the city's plan does not comply.[11] To invalidate a plan, the GMHB must determine "that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]."[12]

The Washington Administrative Procedures Act[13] (WAPA) governs judicial review of GMHB actions. When this court reviews a decision by the GMHB, it stands "in the same position as a superior court reviewing a board's decision."[14] A litigant may challenge the GMHB's action on any of the nine grounds described in the WAPA.[15] Stickney and Birgh claim the GMHB's decision resulted from an erroneous interpretation or application of the law and that substantial evidence did not support it. They have the burden of establishing the invalidity of the GMHB's decision.[16]

---

[10] RCW 36.70A.320(1); Thurston County, 164 Wn.2d at 340.

[11] RCW 36.70A.320(2).

[12] RCW 36.70A.320(3); WAC 365-196-040; Thurston County, 164 Wn.2d at 340.

[13] Ch. 34.05 RCW.

[14] Thurston County, 164 Wn.2d at 340 (citing Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd., 157 Wn.2d 488, 497, 139 P.3d 1096 (2000).

[15] RCW 34.05.570(3).

[16] RCW 34.05.570(1)(a); Thurston County, 164 Wn.2d at 341.

This court reviews a challenge to the GMHB's interpretation or application of the law de novo.[17] When this court interprets a statute, its goal is to "give effect to the legislature's intent."[18] So this court first looks to the legislation's plain language, "considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole."[19] This court gives substantial weight to the GMHB's interpretation of the GMA but is not bound by it.[20] Courts do not liberally construe the GMA.[21]

An assertion that substantial evidence does not support the GMHB's decision raises a mixed question of law and fact.[22] This court determines the applicable law de novo and applies it to the GMHB's findings.[23] It reviews the record to decide if substantial evidence supports challenged findings of fact.[24]

---

[17] King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

[18] TracFone Wireless, Inc. v. Dep't of Revenue, 170 Wn.2d 273, 281, 242 P.3d 810 (2010).

[19] State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013).

[20] Thurston County, 164 Wn.2d at 341.

[21] Thurston County, 164 Wn.2d at 342.

[22] City of Arlington v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 164 Wn.2d 768, 779-80, 193 P.3d 1077 (2008).

[23] City of Arlington, 164 Wn.2d at 779-80.

[24] City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 46, 959 P.2d 1091 (1998).

Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding.[25]

### The Amended Housing Element Complied with the GMA

Stickney and Birgh contend that Sammamish's amended housing element violates the GMA because it does not adequately provide for the existing and projected needs of all economic segments of the community.

The GMA has a number of planning goals, including to "[e]ncourage the availability of affordable housing to all economic segments of the population of this state."[26] To achieve this goal, the GMA requires a city to include a housing element in its comprehensive plan.[27] The GMA mandates that the element "(a) [i]ncludes an inventory and analysis of existing and projected housing needs that identifies the number of housing units necessary to manage projected growth [and] (d) makes adequate provisions for existing and projected needs of all economic segments of the community."[28]

The GMHB has adopted a regulation providing rules for adopting comprehensive plans that parallels this language.[29] It requires that the housing element include the following: "[a]n inventory and analysis of existing and

---

[25] City of Redmond, 136 Wn.2d at 46.
[26] RCW 36.70A.020(4).
[27] RCW 36.70A.070(2); WAC 365-196-400(1)(d)(ii).
[28] RCW 36.70A.070(2).
[29] WAC 365-196-410.

projected housing needs" and "[a]dequate provisions for existing and projected housing needs of all economic segments of the community."[30]

Notably, the GMA does not require "smaller jurisdictions . . . to engage in extensive original research" to develop this inventory and analysis."[31] Instead, it allows them to "rely upon reasonable assumptions derived from available data of a statewide or regional nature or representative of jurisdictions of comparable size and growth rates."[32]

Sammamish's amended housing element identified its current and projected needs as more housing affordable to households in the moderate, low, and very low income categories defined by the CPPs. It identified the proportion of Sammamish's total existing housing supply available for these groups as 5%, 2%, and 0%, respectively. This compares to the countywide target for affordable housing for these groups of 16%, 12%, and 12%, respectively. It identified the city's target growth as 4,640 more units by 2035. Of this growth, 557 units should be affordable for very low income, 557 units should be affordable for low income, and 742 units should be affordable for moderate income households. The amended housing element stated that Sammamish contained sufficient land to meet this goal.

---

[30] WAC 365-196-410(a), (d).
[31] WAC 365-196-050(4).
[32] WAC 365-196-050(4).

As a basis for its housing element, Sammamish adopted the analysis that ARCH produced for member cities. In addition to its own survey data, ARCH gathered information from several sources for its analysis, including the Washington Office of Financial Management (OFM), the United States Census Bureau, the Comprehensive Housing Affordability Strategy, PSRC, King County, and the United States Department of Housing and Urban Development.

The analysis presented extensive data on demographics, incomes, and housing factors for Sammamish, other Eastside cities, East King County, King County, and, in some instances, Washington state.

The data on demographics included measurements of the following:

- The population size in 2000 and 2010 in Sammamish, East King County, and King County

- The percentage of the population that was minority, foreign born, and had limited English proficiency in 2000 and 2010 in Sammamish, East King County, and King County

- The percentage of households in 2010 that fell into one of several different household categories, from single adult alone to family of four or more people in Sammamish, East King County, and King County

- The percentage of people working in Sammamish that lived there in 2010

- The number and percentage of employees in different job sectors in 2012 in Sammamish, East King County, and King County

- The percentage of people employed by public schools in Sammamish in 2010 and 2012

The data on income included measurements of the following:

- The average household income in East King County every year from 1999 to 2013

- The median income levels in 2011 in Sammamish, East King County, and King County

- The percentage of households making 30 to 50% AMI and 50 to 80% AMI in Sammamish, East King County, and King County in 2011

- The relationship between the age of the head of household and income in Sammamish, East King County, and King County in 2011

- The average wage in each employment sector in Sammamish, East King County, and King County in 2010

- The average private sector wages in Sammamish versus other East King County cities in 2008

- The percentage of residents living in poverty in Sammamish, East King County, and King County in 2011[33]

- The number and percentage of households receiving supplemental security income in Sammamish, East King County, and King County in 2000 and 2011

The data on housing included measurements of the following:

- The rate of homeownership in Sammamish in 2000 and 2010

- Rental prices and vacancy rates in East King County and King County in 2000, 2010, and 2013

- The jobs-housing balance in Sammamish, East King County, and King County in 2000 and 2006[34]

---

[33] Poverty level was defined by the United States Census Bureau based on the size of the family, the number of related children, and, for one to two person families, the age of the householder.

- The percentage of different types of housing, including single-family detached and multifamily housing, in Sammamish, East King County, and King County in 2000 and 2011

- The average sales prices and rents in East King County every year from 1999 to 2013

- The average home sales prices in Sammamish, East King County, and King County in 2005, 2010, and 2013

- The percentage of housing units built in 1959 or earlier, 1960 to 1979, 1980 to 1999, and 2000 or later in Sammamish, East King County, and King County

- The proportional increase in homeless students in East King County from the 2007-08 to the 2011-12 school years

- The change in proportion of homeless residents in 2011, 2012, and 2013 in East King County

- The number of residents living in group quarters in Sammamish, East King County, and King County in 1990, 2000, and 2010

- The number of accessory dwelling units per 1,000 square feet detached homes built in Sammamish and East King County between 1994 and 2011

To identify areas of housing need, the analysis provided data on the relationship among income, demographics, and housing availability. These data included the following:

- The affordability of housing stock, renter or owner occupied, to households in the following income categories: less than 50% AMI, 50 to 80% AMI, 80 to 100% AMI, and greater than 100% AMI in Sammamish, East King County, and King County in 2010

---

[34] The jobs-housing balance is the ratio of housing demand from the local workforce to the local housing supply.

- The average rental costs in East King County and King County and the affordability of different monthly rent prices for 80% and 50% AMI each year from 2000 to 2013

- The number of households, by unit, supported by subsidized housing and housing with rent or resale covenants in Sammamish

- The percentage of households that were cost burdened and severely cost burdened in Sammamish, East King County, and King County in 2000 and 2011[35]

- The proportion of cost burdened households that residents owned versus rented in Sammamish, East King County, and King County in 2000 and 2011

- The proportion of lower income households that were cost burdened in 2011 versus higher income households in East King County

- The relationship between cost burdened households and the age of the head of household in East King County in 2011

Finally, the analysis identified the percentage of affordable housing units for each income category existing in Sammamish in 2010 and the percentage need for affordable housing for these categories across King County based on household incomes (Table S-1).

---

[35] A household that pays more than 30% for housing is considered cost burdened. Severely cost burdened households pay greater than 50% income on housing.

TABLE S-1: AFFORDABLE HOUSING AND COUNTYWIDE HOUSING NEEDS, 2010

| HOUSEHOLD INCOME LEVEL | | PCT OF TOTAL HOUSING UNITS AFFORDABLE AT INCOME LEVEL | COUNTY-WIDE HOUSING NEED |
|---|---|---|---|
| Pct of Area Median | | Sammamish | Based on Household Incomes |
| < 30%: | Very Low-Income | 0% | 12% |
| 30% to 50%: | Low-Income | 1% | 12% |
| 50% to 80%: | Moderate-Income | 4% | 16% |
| 80% to 100%: | Middle-Income | 8% | 10% |
| > 100%: | Higher-Income | 86% | 50% |

Source: 2006-2010 CHAS (Comprehensive Housing Affordability Strategy; U.S. Housing and Urban Development).

Based on Sammamish's very small supply of affordable housing for lower income households, the analysis concluded that the city's housing "affordability [did] not approach the countywide need" and that the city should "adopt policies and strategies to plan for and promote the expansion in the availability of housing affordable" at lower income levels.

In its amended housing element, the city described its inventory, current need, projected need, and the numerical target for these lower income categories. In adopting its amended housing element, based upon the described analysis, Sammamish adequately provided for what it identified as the existing and projected need for housing. This satisfies the GMA housing element requirements.

Stickney and Birgh complain about the data relied upon by Sammamish in its analysis and the values described in the amended housing element. Their

challenge appears to be aimed at forcing the city to create more affordable housing for households making greater than 100% AMI. They ignore the fact that the available data shows Sammamish needs significantly more affordable housing for households making 80% or less AMI and has a surplus of housing units affordable to households making greater than 100% AMI.

First, Stickney and Birgh challenge the adequacy of the data the city used for its analysis and amended housing element analysis. They claim that "[t]he GMA does not permit a city to choose what housing data it gathers to inform its housing policies." They identify no language in the GMA that limits the type of data a city may use. They do not reconcile their claim that Sammamish must develop an independent housing needs analysis with the GMHB's regulatory instruction: "In general, smaller jurisdictions will not be expected to engage in extensive original research, but will be able to rely upon reasonable assumptions derived from available data of a statewide or regional nature or representative of jurisdictions of comparable size and growth rates."[36]

Sammamish's housing analysis included a wide range of data from a number of sources. This included local data on income and housing costs. It also included data specific to Sammamish. Stickney and Birgh do not show that

---

[36] WAC 365-196-050(4).

the data sources relied upon by the city were unreliable or inappropriate. They fail to establish the city did not use the proper data.

Second, Stickney and Birgh assert that "Sammamish's housing element cannot quantify projected local housing needs because it lacks any data on the change of its economic and demographic segments over time." Again, Stickney and Birgh do not identify any GMA provision or GMHB regulation requiring development or use of this particular data. And the city's housing analysis considered this type of data. Stickney and Birgh ignore this and fail to provide a legal basis for their assertion that the city needed different data to quantify future local housing needs. This claim fails.

Third, Stickney and Birgh contend that Sammamish had to "gather data about its local housing needs, which are not captured by OFM's population projections" and use this data in its inventory and analysis of housing supply and demand. They claim the city used a "top-down" method to collect its data rather than employing both a "top-down" and "bottom-up" method. But the GMA does not require a city to use a particular data source. It does not express a preference for or distinguish between "top-down" and "bottom-up" data. And the city's housing analysis included extensive data about the local conditions in Sammamish drawn from a variety of sources, not just OFM. The contention that

the city's amended housing element violated the GMA because Sammamish failed to identify local housing needs fails.

Fourth, Stickney and Birgh assert that the city should have included current and future housing numbers for all income groups in the amended housing element. In particular, they complain about the absence of projections for households making 100% or greater than the AMI. The GMA requires a city to identify "existing and projected [housing] needs of all economic segments of the community" in its amended housing element.[37] It does not require the city to identify the housing surplus for economic segments of the community or develop housing targets for economic segments if it has a surplus of available, affordable housing for these segments.

The city's analysis showed a surplus of housing affordable only to those households making more than 100% of AMI. In 2010, these households could afford 86% of the city's housing stock, a substantial surplus over the 50% need identified for King County. The analysis indicated that the city needed more affordable housing for the three lowest income groups identified in the CPPs since households at these levels could afford only 5% of the available housing supply in 2010. Sammamish's available housing for these households satisfied only a tenth of the need the CPPs identified for King County. Stickney and Birgh

---

[37] RCW 36.70A.070(2)(d).

ignore these facts when they assert that the GMA requires that the city include upper income segments in its housing element.

Fifth, Stickney and Birgh assert that "[t]he GMA statutory scheme requires cities to identify and plan for two distinct housing needs: 1) a negotiated growth target based on regional needs, and 2) the existing and projected needs of all economic and demographic groups of the community based on local needs."[38] They cite as authority for these "two housing needs" four different statutory provisions.[39] As discussed above, RCW 36.70A.070(2) requires the city to analyze and inventory existing and projected needs. As discussed below, RCW 36.70A.100 and RCW 36.70A.215 govern the city's coordination of its plan with the countywide and regional plans. RCW 36.70A.115 requires the city to "provide sufficient capacity of land" in its comprehensive plan. These sections do not require a city to identify two separate housing needs in its analysis.

Finally, Stickney and Birgh assert that they attempted to estimate the deficiency of affordable housing options "for all community segments where they could" and presented these findings to Sammamish. An analysis of "deficiency"

---

[38] In their reply brief, Stickney and Birgh disavow much of the arguments advanced in their opening brief and analyzed in this opinion: "Stickney and Birgh's appeal is not about the language of the City's policies and goals, as amended or otherwise. . . . This appeal is concerned solely with the housing numbers the City must collect and identify as a prerequisite to making policies and goals."

[39] RCW 36.70A.070(2), .100, .115, .210.

does not help their argument. They identify no statutory language mandating the type of information they claim the element should have included. So Stickney and Birgh cannot show that the city's amended housing element was clearly erroneous.

### Coordination with Regional Planning Policies

Stickney and Birgh also contend that Sammamish's amended housing element is not coordinated or consistent with the regional and countywide comprehensive plans of the PSRC and King County.

The GMA requires the city to coordinate its plan and ensure it is "consistent with . . . the comprehensive plans . . . of other counties or cities with which the county or city has, in part, common borders or related regional issues."[40] The countywide planning policy is "a written policy statement or statements used solely for establishing a countywide framework from which county and city comprehensive plans are developed and adopted pursuant to this chapter. This framework shall ensure that city and county comprehensive plans are consistent as required in RCW 36.70A.100."[41]

A city's plan "must comply with both the county-wide planning policies and the [GMA]."[42] In developing comprehensive plans, "counties and cities should

---

[40] RCW 36.70A.100; see also WAC 365-196-510(1).
[41] RCW 36.70A.210(1); WAC 365-196-305(1).
[42] WAC 365-196-305(3).

consider using similar policies and assumptions that apply to common . . . issues."[43] Two regional planning policies apply to Sammamish—the King County CPPs and the PSRC's MPPs.

The King County CPPs provide a framework for planning. They direct cities to "[c]onduct an inventory and analysis of existing and projected housing needs of all economic and demographic segments of [its] population" to meet their required housing inventory and needs analysis. They state,

The analysis and inventory shall include the following:

a.  Characteristics of the existing housing stock, including supply, affordability and diversity of housing types;
b.  Characteristics of populations, including projected growth and demographic change;
c.  The housing needs of very-low, low, and moderate-income households; and
d.  The housing needs of special needs populations.

The CPPs identify six income groupings based on the AMI. These include very low income (30% and lower AMI); low income (above 30% to 50% AMI); moderate income (above 50% to 80% AMI); middle income (80% to 100% AMI and above 100% to 120% AMI); and incomes above 120% AMI.

The CPPs direct that cities "should address" several "population, household, and community characteristics" in their needs analysis, including the six income groupings ranging from very low income to above 120% AMI,

---

[43] WAC 365-196-510(3).

"[h]ousing growth targets and countywide affordable housing need for very-low, low and moderate income households" and "[t]he number and proportion of households that are 'cost-burdened.'"

The CPPs focus on King County's "unmet need for housing that is affordable for households earning less than 80 percent of adjusted median income," noting that "[t]he county and all cities share in the responsibility to increase the supply of housing that is affordable to these households." They state that across King County 16% of housing needs to be affordable to moderate income households, 12% housing needs to be affordable to low income households, and 12% housing that is affordable to very low income households.

VISION 2040 includes the PSRC's MPPs. The housing goal of the MPPs is to ensure "a range of affordable, healthy, and safe housing choices to every resident" in the region and "fair and equal access to housing for all people."

The PSRC tracks regional housing affordability using four income categories: middle (80-120% AMI), moderate (50%-80% AMI), low (below 50% AMI), and very low (below 30% AMI). It identifies the regional share of these categories as middle, 22% of households; moderate, 18% of households; low, 12% of households; and very low, 13% of households. It also identifies the

regional share of upper income households earning more than 120% AMI as 35% of households.

The PSRC's policies for addressing housing diversity and affordability in the region include

> [p]rovid[ing] a range of housing types and choices to meet the housing needs of all income levels and demographic groups within the region[,] [a]chiev[ing] and sustain[ing] . . . a sufficient supply of housing to meet the needs of low-income, moderate-income, middle income, and special needs individuals, and [p]romot[ing] homeownership opportunities for low-income, moderate-income, and middle-income families and individuals.

The PSRC identifies best housing practices as "[e]ncourag[ing] interjurisdictional cooperative efforts and public-private partnerships to advance the provision of affordable and special needs housing."[44]

As discussed above, Sammamish's housing analysis included extensive data inventorying the population and the housing supply and measuring costs across economic and demographic groups, including the specific income categories described in the CPPs. The amended housing element identified additional housing affordable to households earning 80% or less of AMI as the city's primary existing and future need. Stickney and Birgh fail to show that Sammamish's amended housing element and housing analysis were inconsistent and not coordinated with the CPPs and MPPs, particularly given the emphasis

---

[44] Stickney and Birgh do not cite directly to the PSRC's MPPs in their brief.

both place on addressing the needs of households in the lowest income categories. The GMHB did not err in deciding the amended housing element brought the city into compliance with the GMA's mandate that city plans are coordinated and consistent with regional and countywide policies.

Rather than identifying language in the policies that supports their claim, Stickney and Birgh focus on what they consider the city's failure to "evaluate their information on housing need in combination with their information on housing supply in order to assess housing gaps, both current and future."

First, they contend that the city's adoption of the countywide need as its own need shows that the city failed to do a correct analysis. But they do not point to language in the CPPs or MPPs requiring two different types of analyses or forbidding a city from adopting the countywide housing need targets for itself.[45] Instead, they cite as authority the PSRC's housing element guide as containing "detailed instructions on how to identify those gaps for both economic and demographic groups." But the guide is not the same as the policy. And they assert, without any support, that the CPPs do not allow a city to adopt the countywide housing need analysis in its own analysis of need.

Second, Stickney and Birgh contend that Sammamish needed to create distinct categories for economic segments above 120% AMI and conduct a

---

[45] Instead, as authority for their contention, they cite to the King County Growth Management Planning Council Agenda Item.

separate analysis for each one. They cite no statute, regulation, policy, or judicial opinion supporting their contention. And they do not address the extensive data included in the housing analysis. Their concern for these higher income groups does not reflect the policy of the CPPs or the MPPs. And they ignore the fact that households in the higher income categories can afford housing affordable to lower income categories.

Finally Stickney and Birgh claim that "there was not substantial evidence before the Board to determine that the goals established by Sammamish were consistent with the requirements of RCW 36.70A.100 and 43.62.035(1)."[46] But they do not address the evidence before the GMHB, in particular, the housing analysis's extensive collection of data. So this argument fails. And because RCW 43.62.035 applies to OFM's approach to determining population projections, it does not govern Sammamish's comprehensive plan.

Stickney and Birgh have not shown that the record before the GMHB shows that Sammamish's amended housing element "is clearly erroneous." Without this showing, their appeal fails.

CONCLUSION

We affirm. Stickney and Birgh fail to establish that Sammamish's housing element and analysis do not comply with the GMA. They also fail to establish

---

[46] Stickney and Birgh incorrectly cite RCW 43.62.035(1). This statute has no subsection (1).

that it is not consistent or coordinated with regional and countywide planning policies. And they do not show that the GMHB's decision was clearly erroneous.

Leach, J.

WE CONCUR:

Andrus, J.                    Mann, ACJ